[Cite as *In re M.P.*, 2023-Ohio-925.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE M.P.

A Minor Child

:
:
:

No. 111608

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 23, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL21107413

---

### *Appearances:*

Gregory T. Stralka, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jordan Mason, Assistant Prosecuting Attorney, *for appellee*.

FRANK DANIEL CELEBREZZE, III, P.J.:

{¶ 1} Defendant-appellant M.P., a minor (d.o.b. 12/04/2006), brings this appeal challenging the juvenile court's delinquency findings on seven counts of rape and two counts of gross sexual imposition. Specifically, M.P. argues that the juvenile court erred in admitting evidence pursuant to Evid.R. 803(4) and erred in finding him delinquent on Counts 1, 2, 3, and 4 because they were based on insufficient

evidence and against the manifest weight of the evidence. After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

{¶ 2} M.P. was charged with seven counts of rape in violation of R.C. 2907.02(A)(2), first-degree felonies (Counts 1-5, 8, and 9), and two counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), third-degree felonies (Counts 6 and 7).

{¶ 3} This case involves four minor child victims who are all siblings: M.J. (d.o.b. 7/21/10), a male; Ch.J. (d.o.b. 2/11/2015), a male; Ca.J. (d.o.b. 11/25/2013), a male; and K.J. (d.o.b. 2/23/2016), a female. M.P. is a paternal uncle to the children. M.P. was accused of sexually assaulting all of the minor children between 2019 and 2020, while the children were in his care. The children discovered that all of them were experiencing sexual assault at the hands of M.P. and eventually alerted their mother, F.M. ("Mother"), who promptly took action to report the conduct. The victims' father is currently incarcerated.

{¶ 4} At arraignment, M.P. denied the allegations of the complaint and was placed on home detention with electronic monitoring and ordered to have no contact with the alleged victims or Mother.

{¶ 5} As trial neared, the court held an in camera hearing to determine the competency of the victims to testify as witnesses. M.J.'s ability to testify was not in question. The court found that Ca.J. and Ch.J. were competent to serve as witnesses. K.J. was determined incompetent to testify and disqualified.

{¶ 6} Prior to trial, the state also filed a notice indicating that, pursuant to Evid.R. 807, it intended to introduce at trial statements made by K.J., and the court held an admissibility hearing. After the hearing, the court issued a journal entry finding that the state did not satisfy all elements required for Evid.R. 807 and forbade the state from using witnesses to bring in K.J.'s statements.

{¶ 7} Trial commenced on March 9, 2022.

{¶ 8} Shannon Hanrahan, an intake child protection specialist from the sex abuse unit of the Cuyahoga County Division of Children and Family Services ("CCDCFS"), testified regarding her involvement with this matter. She stated that after she received the case, she contacted Mother and scheduled interviews. After the individual interviews with each child victim, Hanrahan informed Mother that she would be making a referral for the children to get medical exams and counseling services. Mother did not wait for the referral and immediately took them to the emergency room. On direct-examination, Hanrahan went through her notes from the interviews with each victim.

{¶ 9} The oldest victim, M.J., who was ten years old at the time of the interview, told Hanrahan that "his uncle [M.P.], who he described as a teenager, made him do stuff to his private area at [M.P.]'s house in his room." (Tr. 88.) M.J. detailed that when he was eight or nine years old, M.P. made him "suck his private part and made him hump pillows" and that M.P. had placed his penis in his buttocks. M.J. specified that the contact was "inside" of his buttocks and that it hurt. (Tr. 88.) M.J. told Hanrahan that the conduct occurred more than once but was not able to

give a specific number of times. In 2019, M.J. was sent to Florida to live with his grandparents because he was acting out, which his family presumed was because his father was recently incarcerated. When M.J. returned from Florida, M.J. learned from Ca.J. and Ch.J. that M.P. had been sexually abusing them as well.

{¶ 10} The youngest, K.J., who was four years old at the time of the interview, was "pretty difficult" to interview. (Tr. 91.) She denied that anyone ever touched her vagina or buttocks, denied being forced to touch anyone else's "private," and denied that anyone put their mouth on her vagina or buttocks. However, when M.P. was discussed, she specifically stated that "[M.P.] told her to have sex with Ca.J." Hanrahan emphasized that K.J. herself used the word sex, but was not able to describe what sex was. K.J. also revealed that M.P. has told her in the past "don't tell mommy[.]" (Tr. 91.)

{¶ 11} Ch.J., who was five years old at the time of the interview, disclosed that "[M.P.] put his wee wee in his butt" and specified that it was inside of his buttocks, and that it happened three separate times. (Tr. 92-93.) He also revealed that Ca.J. and K.J. "humped" and that Ca.J. "ate [K.J.'s] butt" and that M.P. "put his wee wee in Ca.J.'s booty." (Tr. 92-93.) He noted that M.P. threatened to kill him if he told on him. On cross-examination, Hanrahan revealed that Ch.J. also referenced an incident when he was one year old where M.P. "had him pump [sic] a pillow and had sex with him." (Tr. 105-106.)

{¶ 12} Ca.J., who was six years old at the time of the interview, told Hanrahan that "[M.P.] touched his private part with his hand and it happened at his house."

(Tr. 94.) He denied that anyone ever put their mouth on his penis or buttocks, but did reveal that M.P. "put his wee wee in [Ch.J.'s] booty" and that M.P. touched K.J. on her private part, and "put his wee wee in [K.J.]'s koochie and booty." (Tr. 94-95.) Ca.J. also stated that M.P. threatened to kill him for telling anyone.

{¶ 13} Hanrahan also interviewed M.P. at his home, who was 13 years old at the time of the interview. M.P. denied all allegations. He told Hanrahan that he's never been inappropriate with the children. He admitted that he babysat the victims but noted that he never helped them in the bath or bathroom, that he never changed any diapers, that he never cooked for the kids, and that they played games like hide-and-seek and tag. He did, however, reveal that Ca.J. and K.J. "did inappropriate stuff with each other" including "humping with their clothes on." (Tr. 97.) M.P.'s mother, who was present for the interview, noted that she would often FaceTime M.P. while he was babysitting and "never saw anything inappropriate going on." (Tr. 98.) M.P. then noted that the victims' Mother had many boyfriends that were in and out of the home and that the child victims are "big liars," and that Mother is "inconsistent with the story she keeps telling everyone." (Tr. 98.) M.P.'s counselor was also present and stated that M.P. had never displayed any inappropriate sexual behaviors or got in trouble at school for inappropriate behavior.

{¶ 14} Hanrahan ultimately testified that at the conclusion of her investigation, she found that the disposition was substantiated.

{¶ 15} Angella McMahan and Kate Burns, the University Hospitals Sexual Assault Nurse Examiners (collectively "SANE nurses"), testified regarding their

respective examinations of each of the victims. McMahan examined M.J. and K.J. while Burns examined Ch.J. and Ca.J. Both SANE nurses testified regarding their qualifications, the history-taking process, and the specific examinations they performed on each victim.

{¶ 16} Mother testified that prior to M.J. going to Florida, she often dropped M.J. off at M.P.'s house but eventually he stopped going. Ca.J. and Ch.J. also went over a few times. Eventually, M.P.'s family home caught on fire and M.P. and M.P.'s mother came to stay with Mother and the child victims at their home. She testified that M.P. and the children had a great relationship and that she often left M.P. alone with the child victims. She stated that he was alone with them in the upstairs portions of the house very often because the kitchen and bathroom were being redone, so the children could not walk downstairs due to the floor being torn apart.

{¶ 17} Regarding M.J., Mother testified that she sent him to Florida because he was threatening suicide and she could not control him. She stated that he went from being "a good kid at school to fighting all the time, bad grades, watching porno," and that he tried to jump out of a window. (Tr. 115.) She stated that sending him to Florida was a last resort.

{¶ 18} Three out of the four child victims, M.J., Ca.J., and Ch.J. all testified. M.J., the oldest, testified that M.P. "made me touch his private part and hump stuff and nasty stuff." (Tr. 136.) He testified that M.P. put his penis inside of his buttocks three times, "almost inside," that he did not want this to happen, and that it "hurted." (Tr. 137.)

{¶ 19} Ca.J. testified that M.P. put his penis in his buttocks four times, that he did not want him to do that, and that it made him feel "weird." (Tr. 155.) He also testified that M.P. made him have sex with K.J. and that he saw M.P. place his penis in Ch.J.'s buttocks. Ca.J. ultimately testified that he did not initially tell anyone about any of the above activity because M.P. "said he was gonna stab me with a knife or slap me." (Tr. 158.) On cross-examination, when asked what "sex" meant, Ca.J. kind of shrugged his shoulders, but on redirect, clarified that when he stated that M.P. made him have sex with K.J., he meant that he put "his private part" in "her private part." (Tr. 162.)

{¶ 20} Ch.J. testified that he saw M.P. make Ca.J. "pump [sic] [K.J.]" and put his penis in Ca.J.'s buttocks. (Tr. 170.) He testified that M.P. said to Ca.J., "if you don't have sex with [K.J.], I will kill you, then I will slap you, then I'm gonna tell your mommy you was having sex with your sister." (Tr. 172.) Ch.J. was unable to identify what sex was but was adamant that M.P. made Ca.J. and K.J. engage in it. He identified that when K.J. was on top of Ca.J., he saw both of their "private parts" touching. Ch.J. also admitted that once, M.P. put his penis inside of his buttocks, that he didn't want M.P. to do that, and that it hurt him.

{¶ 21} Following the trial, the court issued a journal entry stating that it was holding its decision in abeyance until March 16, 2022. On this date, a hearing was held and the court adjudicated M.P. delinquent on all charges and ordered the probation department to prepare a predispositional report and refer M.P. for a sex

offender assessment. M.P. was placed in the juvenile detention center until the dispositional hearing.

{¶ 22} M.P.'s dispositional hearing was held on May 4, 2022. The trial court sentenced M.P. to a term at the Ohio Department of Youth Services ("ODYS") for a minimum of one-year, with the potential that he be kept until his 21st birthday on Counts 1, 5, and 8, which were all run consecutively. On Count 7, he was sentenced to six months at ODYS, with the potential that he be kept until his 21st birthday. This count was run concurrently. The trial court did not impose any additional time for Counts 2, 3, 4, and 6. The trial court, however, suspended the ODYS commitment and placed him on community-control supervision for a period of two years, and required him to instead present to the Butler County Correctional Facility to complete services there, including sex offender treatment and 75 hours of community service.

{¶ 23} M.P. appealed, assigning four errors for our review.

I. The decision of [the] trial court finding the Appellant delinquent was not supported by admissible evidence as defined under Rule 803(4) of the Ohio Rules of Evidence.

II. The decision of the trial court finding the Appellant delinquent on Counts 3 and 4 was not supported by sufficient evidence.

III. The decision of the trial court finding the Appellant delinquent on Counts 1 and 2 was not supported by sufficient evidence.

IV. The decision of trial court finding the Appellant delinquent on Counts 1, 2, 3, and 4 was against the manifest weight of the evidence.

## II. Law and Analysis

### A. Evid.R. 803(4)

{¶ 24} In his first assignment of error, M.P. argues that the trial court erred in admitting evidence pursuant to Evid.R. 803(4).

{¶ 25} The admission or exclusion of evidence is left to the trial court's sound discretion and will not be disturbed absent an abuse of discretion. *State v. Simmons*, 8th Dist. Cuyahoga No. 98613, 2013-Ohio-1789, ¶ 18, citing *State v. Frazier*, 8th Dist. Cuyahoga No. 97178, 2012-Ohio-1198, ¶ 17. An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. Such an abuse ""implies that the court's attitude is unreasonable, arbitrary or unconscionable."" *State v. Montgomery*, 169 Ohio St.3d 84, 2022-Ohio-2211, ___N.E.3d___, ¶ 135, quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 26} Hearsay is "'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *Simmons* at ¶ 19, quoting Evid.R. 801(C). Hearsay evidence is inadmissible unless it falls within one of the exceptions outlined in the rules of evidence. *Id.*, citing Evid.R. 802. The instant matter implicates Evid.R. 803(4), which allows hearsay statements that are

made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

{¶ 27} On appeal, M.P. disputes the admissibility of the victims' statements to Hanrahan, McMahan, and Burns. Since the SANE nurses and the CCDCFS specialist are different roles, we review each individually.

{¶ 28} We first turn to M.P.'s assertion that the testimony of CCDCFS worker Hanrahan could not have fit into the Evid.R. 803(4) exception. This court has previously found that statements made to CCDCFS employees in the same role as Hanrahan were admissible pursuant to Evid.R. 803(4), so long as the statements were received for purposes of diagnoses and treatment. *See, e.g., In re V.H.*, 8th Dist. Cuyahoga No. 111186, 2022-Ohio-3432, ¶ 27; *State v. Schentur*, 8th Dist. Cuyahoga No. 108448, 2020-Ohio-1603, ¶ 45; *State v. Jeffries*, 8th Dist. Cuyahoga No. 106889, 2018-Ohio-5039, ¶ 16; *State v. Fears*, 8th Dist. Cuyahoga No. 104868, 2017-Ohio-6978, ¶ 46; *State v. Diaz*, 2016-Ohio-5523, 69 N.E.3d 1182, ¶ 49 (8th Dist.). In cases of sexual assault, "a description of the encounter and identification of the perpetrator are within the scope of statements for medical treatment and diagnosis." *In re D.L.*, 8th Dist. Cuyahoga No. 84643, 2005-Ohio-2320, ¶ 21, citing *State v. Stahl*, 9th Dist. Summit No. 22261, 2005-Ohio-1137, ¶ 15; *see also Fears* at ¶ 45 (noting that "[t]he determination regarding whether the alleged perpetrator has access to the child victim necessarily involves a treatment plan insofar as it ensures the child is free of the abuse"). Recently, the Ohio Supreme Court has also noted

that "the identity of the perpetrator, the age of the perpetrator, the type of abuse alleged, and the time frame of the abuse" are all within the realm of "medical diagnosis." *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 143, citing *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 32. In *Fears*, this court explained:

> In sexual assault cases involving young victims, there is often testimony from a child advocacy social worker. And courts have acknowledged the "dual role" — medical diagnosis/treatment and investigation/gathering of evidence — of social workers who interview a child who may be the victim of sexual abuse. *See State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 33, 933 N.E.2d 775. Only those statements made for the purpose of diagnosis and treatment are admissible under Evid.R. 803(4). *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, ¶ 46, 875 N.E.2d 944 (regardless of whether a child less than ten years old has been determined to be competent to testify, the child's statements may be admitted at trial as an exception to the hearsay rule if they were made for purposes of medical diagnosis or treatment); *State v. Goza*, 8th Dist. Cuyahoga No. 89032, 2007-Ohio-6837, ¶ 39. Social workers are oftentimes in the best position to help determine the proper treatment for the minor, which treatment includes determining which home was free of sexual abuse. *State v. Durham*, 8th Dist. Cuyahoga No. 84132, 2005-Ohio-202, ¶ 33, citing *Presley v. Presley*, 71 Ohio App.3d 34, 39, 593 N.E.2d 17 (8th Dist.1990).
>
> To the extent a victim's statement to a social worker is for investigative or prosecutorial purposes, the statement will not fall within the hearsay exception under Evid.R. 803(4). *See State v. Rose*, 12th Dist. Butler No. CA2011-11-214, 2012-Ohio-5607, ¶ 42. The fact that the information initially gathered by the social workers was subsequently used by the state in its prosecution, however, does not change the fact that these statements were not made for investigative or prosecutorial purposes. *Muttart* at ¶ 62. Trial courts are entrusted with recognizing the point at which nontestimonial (admissible under Evid.R. 803(4)) statements become testimonial (falling outside the hearsay exception). *See Davis v. Washington*, 547 U.S. 813, 828, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

*Fears* at ¶ 37-38.

{¶ 29} M.P. also disputes that the SANE nurses could have testified pursuant to the Evid.R. 803(4) exception. As with the testimony from the CCDCFS social workers, this court has previously upheld testimony by SANE nurses regarding what the minor child victims told them, provided it was purposed for medical diagnosis and treatment. *See In re V.H.* at ¶ 27; *State v. Magwood*, 8th Dist. Cuyahoga No. 105885, 2018-Ohio-1634, ¶ 44 ("The entire narrative, with the exception of the last paragraph, includes a detailed description of the rape and is undoubtedly made for purposes of medical diagnosis or treatment."); *Diaz* at ¶ 49; *State v. Ceron*, 8th Dist. Cuyahoga No. 99388, 2013-Ohio-5241, ¶ 60; *In re C.A.*, 8th Dist. Cuyahoga No. 102675, 2015-Ohio-4768, ¶ 69.

{¶ 30} M.P. argues that "there was no medical diagnosis to be made from taking the alleged children victims to the hospital, nor was there any concerns for the safety of them in the home." He argues instead that the hospital visit was strictly "to gather evidence for an alleged crime" and not purposed for treating or diagnosing the children. He also argues that the CCDCFS employee could not have been treating or diagnosing the children because CCDCFS was called several weeks after any alleged sexual activity. He directs us to the concurring opinion in *Jeffries*, which cautioned against the broad interpretation of Evid.R. 803(4) that courts allow in child abuse cases. *Id.* at ¶ 19. Nonetheless, we note that even the concurring opinion admits, "I am constrained by the existing state of the law to find no abuse of discretion occurred in this matter" and calls on the Ohio Supreme Court to revisit

the parameters of testimony that may be elicited under this exception. *Jeffries* at ¶ 28 (S. Gallagher, P.J., concurring). The Supreme Court has not visited this issue since *Jeffries*, so we continue to apply the law as it exists in this court and the Ohio Supreme Court.

{¶ 31} The record does not support M.P.'s contentions. Hanrahan, the CCDCFS worker, specifically testified that Mother took the children to the emergency room after CCDCFS conducted interviews and agreed that during these interviews, she was assessing the safety of the victims. She explained that her role as CCDCFS employee is to "investigate allegations of sexual abuse." (Tr. 79.) As this court recognized in *Fears*, 8th Dist. Cuyahoga No. 104868, 2017-Ohio-6978, Hanrahan, as a CCDCFS employee, holds a dual role in providing medical diagnosis and treatment as well as performing an investigation and gathering evidence. There is no evidence in this case that Hanrahan was not seeking to diagnose and treat the child victims in this case.

{¶ 32} McMahan, the SANE nurse, specifically testified that "[w]e do not do this medical care for prosecution. This is for treatment and care of sexual assault victims or patients, and that is the purpose of this charting and the care." (Tr. 53.) She also testified that "whenever a patient is brought into the Emergency Department, I am called out as a consult to see them and to care for them" and that "[w]e need to know what happened to the child or the patient because it guides our exam, it guides medication, it guides every bit of care and treatment that we do for these patients." (Tr. 15 and 25.) The victims' statements provided to the SANE

nurses allowed them to understand where to look for any injury or even explain the absence of injury. The victims reported where the assaults occurred, the nature and frequency of the assaults, whether they experienced pain or discomfort, whether an ejaculation occurred, and whether strangulation or pornography were concerns. This information was plainly received for the purpose of medical diagnosis and treatment to allow the SANE nurses to determine how to best examine and treat each victim.

{¶ 33} We have thoroughly reviewed the testimony offered by Hanrahan, McMahan, and Burns, and do not find any instance where the testimony offered was solely for prosecutorial or investigative purposes. We therefore overrule M.P.'s first assignment of error.

## B. Sufficiency of the Evidence

{¶ 34} In his second assignment of error, M.P. contends that insufficient evidence existed to support the trial court's finding of delinquency on Counts 3 and 4. In his third assignment of error, M.P. contends that insufficient evidence existed to support the trial court's finding of delinquency on Counts 1 and 2. For ease of discussion, we address both assignments of error together.

{¶ 35} To establish Counts 1 and 2, both of which were charges of rape, first-degree felonies under R.C. 2907.02(A)(2), the state was required to prove that M.P. engaged in sexual conduct, to wit: fellatio, with M.J. by purposely compelling him to submit by force or threat of force between April 1, 2019, and September 18, 2020.

{¶ 36} To establish Counts 3 and 4, both of which were charges of rape, first-degree felonies under R.C. 2907.02(A)(2), the state was required to prove that M.P. engaged in sexual conduct, to wit: anal penetration, with M.J. by purposely compelling him to submit by force or threat of force between April 1, 2019, and September 18, 2020.

{¶ 37} The standard of review for issues involving sufficiency of the evidence in delinquency adjudications is the same as the standard for adults; the evidence is viewed in the light most favorable to the state to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *In re T.N.R.*, 8th Dist. Cuyahoga No. 111367, 2023-Ohio-85, ¶ 38, citing *In re D.C.*, 2018-Ohio-163, 104 N.E.3d 121, ¶ 3 (8th Dist.), citing *In re Washington*, 81 Ohio St.3d 337, 339, 691 N.E.2d 285 (1998). In conducting a sufficiency review, appellate courts are cautioned that the onus is on the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences. *Id.*, citing *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161. The charge of the appellate court is to determine whether the evidence against a defendant, if believed, supports the convictions. *Id.*, citing *Jones* at ¶ 16, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 38} Regarding Counts 3 and 4, M.P. directs us to *State v. Wells*, 91 Ohio St.3d 32, 740 N.E.2d 1097 (2001), which held that "[i]f the evidence shows that the defendant made contact only with the victim's buttocks, there is not sufficient evidence to prove the defendant guilty of the crime of anal rape." M.P. also directs

us to this court's decision in *In re D.C.*, where this court noted that the child victim's testimony (1) did not establish what he meant by his "bottom"; (2) did not indicate that penetration occurred; and (3) did not differentiate between merely the cheeks of the buttocks or the actual anal cavity. *Id.* at ¶ 8. We also note that R.C. 2907.01(A) defines "sexual conduct" as "the insertion, *however slight*, of any part of the body * * * into the vaginal or anal opening of another." (Emphasis added.)

{¶ 39} We find the instant matter distinguishable from *In re D.C.* because the record in this case contains much more evidence than the record in *In re D.C.* We specifically note that, during his interview with McMahan, M.J. stated that "poop comes out of his bottom" and that M.P. placed his private "inside" of M.J.'s bottom. (Tr. 32-33.) Neither party disputes that M.J. could identify the relevant parts of his body. M.J. clarified to McMahan that when M.P. did this, it hurt, and that it happened "more than one time." (Tr. 34.) M.J. told Hanrahan that M.P. "was putting his private in his butt and specified that it was the inside of his butt, and that it hurt, and that it occurred more than one time, but was not able to give a specific amount of times." (Tr. 88.) M.J. himself testified that M.P. tried to "put his private part in my butt," but when asked if he was successful, stated "not really." (Tr. 137.) The state asked M.J. whether M.P. placed his private part on top of his buttocks or inside of it, and M.J. answered "almost inside." (Tr. 137.) M.J. further testified that he did not want this to happen, that it happened three times, and that "it hurted." (Tr. 138.) We note that unlike in *In re D.C.*, M.J.'s testimony was significantly detailed and indeed, even the fact that M.P.'s actions hurt him would allow a trier of

fact to conclude that penetration of the actual anal cavity occurred and that M.J.'s testimony that the attempt was "not really" successful could rise to the level of slight penetration.  These critical facts were absent from *In re D.C.*

{¶ 40} Regarding Counts 1 and 2, M.P. again refers us to *Wells* and *In re D.C.*, 2018-Ohio-163, 104 N.E.3d 121, and notes that the evidence was insufficient for a finding of delinquency on the fellatio counts because M.J.'s testimony was only that "[M.P.] made contact with his private part" and that no "additional testimony elicited from M.J. * * * specifically indicated [M.P.] penetrated the mouth opening of M.J. with his private part."

{¶ 41} We are unpersuaded by M.P.'s contention.  McMahan, reading from her SANE examination notes, testified that M.J. said that M.P. "made me suck his private." (Tr. 34.)  McMahan also showed M.J. a diagram of the human body and asked him to "circle where [M.P.] put his private in his body" and M.J. circled the mouth and the buttocks. (Tr. 36.)  Hanrahan testified that during her interview with M.J., he told her that M.P. "made him suck his private part." (Tr. 88.)  On cross-examination, Hanrahan testified that M.J. himself used the word "suck" when describing the conduct.  When Hanrahan asked M.J. what "suck" meant, M.J. stated "[t]hat he put his mouth on [M.P.]'s private." (Tr. 108.)  M.J. himself testified that he "touched" M.P.'s penis with his mouth, that it also happened three times, and that he did not want that to happen. (Tr. 138.)

{¶ 42} After reviewing the record in the light most favorable to the state, we find that there was sufficient evidence for the court to find M.P. delinquent of Counts

1, 2, 3, and 4. The evidence discussed above is sufficient for a rational trier of fact to find beyond a reasonable doubt that M.P. engaged in the sexual conduct described by each count on four separate occasions.

{¶ 43} M.P.'s second and third assignments of error are overruled.

## C. Manifest Weight of the Evidence

{¶ 44} In his final assignment of error, M.P. argues that the delinquency findings on Counts 1, 2, 3, and 4 were against the manifest weight of the evidence.

{¶ 45} As with a sufficiency analysis, a challenge to the manifest weight of the evidence in juvenile proceedings is accorded the same standard of review as applied in adult criminal convictions. *In re A.W.*, 8th Dist. Cuyahoga No. 103269, 2016-Ohio-7297, ¶ 43, citing *In re N.J.M.*, 12th Dist. Warren No. CA2010-03-026, 2010-Ohio-5526, ¶ 34. A manifest weight analysis requires an appellate court to function as a "thirteenth juror" and may disagree "with the factfinder's resolution of * * * conflicting testimony." *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The appellate court is charged with examining the entire record, weighing the evidence and all reasonable inferences that may be drawn therefrom, and considering the witnesses' credibility. *Thompkins* at 387. In resolving conflicts in the evidence, the appellate court determines whether the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered.'" *Thompkins* at *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 46} M.P. does not set forth any arguments that differ from his sufficiency challenge to the same counts. In his brief, he restates that "the necessary testimony evidence did not show [M.P.'s] private part even penetrated either the anus or mouth of the alleged victim, M.J., of those counts."

{¶ 47} In addressing M.P.'s third and fourth assignments of error, we reviewed the evidence proffered pursuant to Counts 1, 2, 3, and 4. The evidence was sufficient to demonstrate that both anal penetration and fellatio happened on at least four occasions.

{¶ 48} The evidence in this case is almost exclusively testimonial and consists of statements from the victims. M.J.'s testimony in particular remained consistent when interviewed by McMahan, Hanrahan, and on the stand when testifying himself. We specifically note that during the initial interview with Hanrahan and McMahan, M.J. was unable to give an exact number of times that the conduct happened but noted that it happened more than once. At trial, M.J. was able to specify that both anal penetration and fellatio occurred three times each, which is not inconsistent with his prior testimony to McMahan and Hanrahan. On cross-examination, M.P.'s defense counsel was given the opportunity to ask whether anyone had coached M.J. regarding his testimony, and we cannot say anything significant came from this questioning. Nothing in the record allows us to conclude that M.J. was an unreliable witness.

{¶ 49} We also cannot make any other inferences from the testimony as presented — M.J. unequivocally and consistently maintained that the sexual

conduct that M.P. forced him to engage in involved both his buttocks and his mouth. Based on the foregoing, we cannot say that the trial court clearly lost its way and created a manifest miscarriage of justice in adjudicating M.P. delinquent. We therefore overrule M.P.'s final assignment of error.

### III. Conclusion

{¶ 50} The trial court did not err in admitting evidence from Hanrahan, McMahan, and Burns because the evidence offered was properly found to comply with Evid.R. 803(4), a hearsay exception. We also find that the trial court's delinquency findings on Counts 1, 2, 3, and 4 were not based on insufficient evidence and were not against the manifest weight of the evidence.

{¶ 51} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution. The defendant's adjudications having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of commitment.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
FRANK DANIEL CELEBREZZE, III, PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
EMANUELLA D. GROVES, J., CONCUR