[Cite as *State v. Washington*, 2023-Ohio-1667.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 111544 |
| v. | : | |
| PHILLIP WASHINGTON, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED AND REMANDED
**RELEASED AND JOURNALIZED:** May 18, 2023

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-650787-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Glen Ramdhan, Assistant Prosecuting Attorney, *for appellee.*

Robert A. Dixon, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant Phillip Washington ("Washington") was sentenced to life in prison without the possibility of parole after a jury found him guilty of multiple counts of rape and gross sexual imposition involving a young child. Washington contends that his rape convictions were not supported by sufficient

evidence and were against the manifest weight of the evidence. He further contends that (1) he was denied due process and a right to a fair trial based on references to the complainant as "the victim" at trial, (2) the trial court failed to properly instruct the jury regarding the use of force for purpose of the rape charges, (3) he was denied the effective assistance of counsel and (4) his life sentence without the possibility of parole constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Article I, Sections 9, 10 and 16 of the Ohio Constitution. For the reasons that follow, we affirm the trial court.

**Procedural History and Factual Background**

{¶ 2} On May 26, 2020, a Cuyahoga County Grand Jury indicted Washington on 12 counts as follows:

- One count of rape of a child under 13 who was not the spouse of the offender in violation of R.C. 2907.02(A)(1)(b), a first-degree felony — "1st incident" anal penetration on or about January 1, 2018 to January 5, 2019 — with a furthermore clause, i.e., that the defendant "purposely compelled the victim, who was under ten years of age at the time of the commission of the offense * * * to submit by force or threat of force" (Count 1)

- One count of gross sexual imposition of a child under 13 who was not the spouse of the offender in violation of R.C. 2907.05(A)(4), a third-degree felony — "1st time; touched butt and thighs" on or about January 1, 2018 to January 5, 2019 (Count 2)

- One count of rape of a child under 13 who was not the spouse of the offender in violation of R.C. 2907.02(A)(1)(b), a first-degree felony — "2nd described incident" anal penetration on or about January 1, 2018 to January 5, 2019 — with a furthermore clause, i.e., that the defendant "purposely compelled the victim, who was under ten years of age at the time of the commission of the offense * * * to submit by force or threat of force" (Count 3)

- One count of rape of a child under 13 who was not the spouse of the offender in violation of R.C. 2907.02(A)(1)(b), a first-degree felony — anal penetration on or about January 5, 2019 to March 21, 2019 — with a furthermore clause, i.e., that the defendant "purposely compelled the victim, who was under ten years of age at the time of the commission of the offense * * * to submit by force or threat of force" (Count 4)

- One count of gross sexual imposition of a child under 13 who was not the spouse of the offender in violation of R.C. 2907.05(A)(4), a third-degree felony — "touched chest" on or about January 5, 2019 to March 21, 2019 (Count 5)

- One count of rape of a child under 13 in violation of R.C. 2907.02(A)(1)(b), a first-degree felony — vaginal penetration on or about March 22, 2019 to May 2, 2020 — with a furthermore clause, i.e., that the defendant "purposely compelled the victim, who was under ten years of age at the time of the commission of the offense * * * to submit by force or threat of force" (Count 6)

- One count of rape of a child under 13 in violation of R.C. 2907.02(A)(1)(b), a first-degree felony — anal penetration on or about March 22, 2019 to March 21, 2020 — with a furthermore clause, i.e., that the defendant "purposely compelled the victim, who was under ten years of age at the time of the commission of the offense * * * to submit by force or threat of force" (Count 7; later renumbered as Count 6)

- One count of rape of a child under 13 in violation of R.C. 2907.02(A)(1)(b), a first-degree felony — vaginal penetration on or about March 22, 2019 to March 21, 2020 — with a furthermore clause, i.e., that the defendant "purposely compelled the victim, who was under ten years of age at the time of the commission of the offense * * * to submit by force or threat of force" (Count 8)

- One count of gross sexual imposition of a child under 13 in violation of R.C. 2907.05(A)(4), a third-degree felony — "touched butt, vagina, chest" on or about March 22, 2019 to March 21, 2020 (Count 9; later amended to reference vagina only and renumbered as Count 7)

- One count of gross sexual imposition of a child under 13 in violation of R.C. 2907.05(A)(4), a third-degree felony — "touched chest" on or about March 22, 2020 (Count 10; later renumbered as Count 8)

- One count of rape of a child under 13 in violation of R.C. 2907.02(A)(1)(b), an unspecified felony — cunnilingus on or about March 22, 2020 — with a furthermore clause, i.e., that the defendant "purposely compelled the victim, who was under thirteen years of age but ten years of age or older at the time of the commission of the offense * * * to submit by force or threat of force" (Count 11; later renumbered as Count 9)

- One count of rape of a child under 13 in violation of R.C. 2907.02(A)(1)(b), an unspecified felony — anal penetration on or about March 22, 2020 to May 2, 2020 with a furthermore clause, i.e., that the defendant "purposely compelled the victim, who was under thirteen years of age but ten years of age or older at the time of the commission of the offense * * * to submit by force or threat of force" (Count 12; later renumbered as Count 10)[1]

The rape counts also included notice-of-prior-conviction and repeat-violent-offender specifications based on Washington's prior conviction for burglary in 2014.

{¶ 3} The charges in this matter relate to the alleged assault of M.F., the daughter of Washington's then-girlfriend. At the time of the alleged offenses, M.F. was between eight and ten years old. Washington pled not guilty to all charges.

{¶ 4} The case proceeded to trial on March 23, 2022. Washington waived his right to a jury trial on the notice-of-prior-conviction and repeat-violent-offender specifications; the remaining issues were tried to a jury.

---

[1] Prior to trial, the state moved, pursuant to Crim.R. 7(D), to amend the indictment to correct a couple of clerical errors in the dates set forth in Counts 3 and 4 as originally indicted. The trial court granted the motion. The dates set forth above reflect those amendments.

{¶ 5} At trial, the state presented testimony from nine witnesses, including M.F., M.F.'s mother ("Mother") and M.F.'s father ("Father"). Washington testified in his defense. At the time of trial, M.F. was 12 years old. A summary of the relevant evidence follows.

{¶ 6} Kelley Lott, a forensic nurse and sexual assault nurse examiner ("SANE") at Hillcrest Hospital, examined M.F. when Father brought M.F. to the hospital's emergency department on May 3, 2020. She identified and authenticated emergency department records relating to her sexual assault examination of and related discussions with, M.F. Lott testified that M.F., who was then ten years old, arrived in the emergency department at 12:24 a.m. and was discharged at 5:00 a.m. Lott stated that she spoke with Father briefly to determine what brought them to the emergency department. She then spoke with M.F., alone, in the SANE examination room, eliciting a history of what had happened "for treatment and assessment purposes," to identify areas in which an injury may have occurred and to identify where there may be DNA or other evidence to collect.

{¶ 7} Lott testified that she recorded M.F.'s answers to her questions, in writing, as they spoke, explaining that it is "very important" to accurately document what a patient says "in real time, as the patient is providing the information." As documented in the emergency department records, Lott's conversation with M.F. included the following exchange, which Lott read to the jury:

[Lott]: What made you come to the hospital?

[M.F.]: They went to the grocery store, and then they came back and saw me crying. I said nothing.

His girlfriend, [C.S.], asked me, Let's go talk about what's wrong, and she asked me, Do he be touching you?

And I said, Yes.

And then she said, Do he be touching you on your butt and your private part?

And I said, Yes.

[Lott]: Can you tell me more about that?

[M.F.]: Okay. * * * [Patient covers face.] Like he be touching me on my butt and my private part and my chest and stuff, and he put his private part in my butt.

[Lott]: Where the poop comes out?

[M.F.]: Yeah.

[Lott]: Does he ever put his private part in your front?

Patient shakes head indicating yes.

[Lott]: When was the last time he put his private part in you?

[M.F.]: Friday. The Friday I came over to my grandma's house.

[Lott]: Where were you when this happened?

[M.F.]: At home. * * * [On] the couch watching TV.

[Lott]: Was your mom home?

[M.F.]: Yes.

[Lott]: Where was she?

[M.F.]: She was asleep in the basement.

[Lott]: How long has this been going on?

[M.F.]: Like two to three months, I think.[2]

[Lott]: Does your mom's boyfriend put anything on his penis or private part?

[M.F.]: No, he put it on mine.

[Lott]: Like, does he cover it with anything?

[M.F.]: No.

[Lott]: Does anything come out of his penis?

Patient shakes head yes.

[Lott]: Can you tell me about that?

[M.F.]: I don't know what that is.

[Lott]: What does it look like?

[M.F.]: It's like — like white stuff.

[Lott]: Does it ever go on your body?

[M.F.]: Shakes head yes.

[Lott]: Where on your body?

[M.F.]: Like on my butt and stuff.

[Lott]: Does anything hurt right now?

[M.F.]: No.

---

[2] Lott testified that, with respect to M.F.'s reference to "two to three months," she could not say whether M.F. was referring to (1) the length of time M.F. had been abused or (2) the length of time Mother had been sleeping in the basement. Lott explained that children are "very literal" and that M.F. "may have been referring to the previous topic [Lott] had just discussed with her" with her response. Mother later testified that, in May 2020, she had been sleeping in the basement for two to three months.

[Lott]: Does anything ever hurt after he hurts you?

[M.F.]: Like my private part and my butt.

{¶ 8} Lott testified that, after explaining to M.F. what would occur, she conducted a sexual assault examination of M.F. and swabbed areas of her body that may have been licked, kissed, bitten or had skin-to-skin contact with her assailant, including M.F.'s mouth, back, buttocks, butt cheeks, breasts, fingernails, inner thighs and external genitalia. She then placed these swabs in the sexual assault evidence collection kit.

{¶ 9} Lott stated that, during evidence collection, M.F. further disclosed that her assailant had put his penis in her mouth and had licked her chest and "private area." Lott testified that the alleged assailant was Mother's boyfriend, Washington. Lott indicated that she had noted, in the section of the medical records identifying "type of contact," M.F.'s disclosure of: (1) vaginal and anal "penetration" by assailant's penis, (2) anal and vaginal "contact" with assailant's penis, (3) contact between assailant's mouth and patient's genitals, (4) contact between patient's mouth and assailant's genitals, (5) touching of "chest, specifically[,] left breast" and (6) ejaculation (based on M.F.'s description of "the white stuff coming out of his private part"). Lott stated that medical records reflected no disclosure of lubrication or condom use. Lott indicated that the underwear M.F. had worn to the exam was collected and included in the sexual assault examination collection kit.

{¶ 10} Lott testified that she saw no visible injuries, such as bruising or vaginal or anal tearing, during her examination of M.F. but explained that in sexual

assault cases, it is "uncommon" to see injuries to a patient's vagina or rectum ("unless there is * * * a level of violence being perpetrated") because "those body parts are made to stretch and tolerate penile insertion, or insertion of objects." Lott testified that, when her examination was complete, she secured M.F.'s sexual assault evidence collection kit and released it to Officer Moore with the Maple Heights Police Department.

{¶ 11} M.F.'s mother testified that she had seven children (four boys and three girls), including M.F. She stated that Washington was the father of one of her children (a boy who was then nine) and that she had begun a relationship with Washington approximately ten years earlier. Mother stated that Washington had lived with her and her children for several years. She testified that they had lived in a home on Clearaire Avenue in Cleveland for approximately three years until January 2019. They then moved to a home on Alice Avenue in Cleveland. In June or July 2019, the family moved to a home on Turney Road in Maple Heights. Mother stated that the girls all slept in the one room, the boys all slept in another room and Washington slept with Mother in Mother's room.

{¶ 12} Mother testified that on May 3, 2020, officers from the Maple Heights Police Department came to her home and requested permission to search the home in connection with a report that M.F. had been "sexually molested." Mother stated that she was "shocked" and consented to the search. Mother testified that officers searched M.F.'s room and took "[t]he clothes she was wearing." She indicated that they also used a blue light to examine M.F.'s bed and the couch on which M.F.

sometimes slept, looking for bodily fluids. Mother stated that Washington was present when the officers arrived, that the officers spoke with Washington and requested a DNA sample and that Washington complied with their request.

{¶ 13} Mother testified that although Washington was not M.F.'s biological father, he was a "father figure" or "stepdad" to M.F. and her other children, i.e., "taking care of the kids, like feeding them, taking them places * * * like what * * * a dad is supposed to do." Mother stated that Washington had authority over M.F. as an adult and a father figure in the home, but that Mother was responsible for discipline. She indicated that if M.F. violated Washington's rules while Mother was absent, he would tell Mother about it, and Mother would "handle it."

{¶ 14} Mother testified that M.F. referred to Washington as "dad" or "Big Phil." She described Washington as having been a "good father" to all her children, that she had never observed any conduct that she was believed was inappropriate between Washington and M.F. (or any of her other children) and that M.F. had never told her that anything inappropriate had happened between her and Washington. Mother acknowledged that she had previously told the police and the Cuyahoga County Division of Children and Family Services ("CCDCFS") that Washington was never left alone with the children long enough that anything inappropriate could have happened. Mother also acknowledged, however, that if something inappropriate had been going on while she was sleeping, she would not have known about it. Mother testified that in May 2020, she was sleeping in the basement and had been doing so for "[l]ike two to three months."

{¶ 15} Mother testified that she had previously told CCDCFS that she believed Father was "coaching" and "brainwash[ing]" M.F. so that he could get custody of her. Mother indicated that had believed this, in part, because other people had told her that M.F. was using words to describe being sexually assaulted by Washington that Mother did not believe were in M.F.'s vocabulary. Mother acknowledged, however, that she did not, in fact, know what M.F. had said during any of her interviews because Mother was not present during those interviews; she was just "going off" what others had told her.

{¶ 16} Mother stated that M.F. had seen her biological father infrequently, i.e., "[p]robably like a good five times," before the summer of 2019 because Mother and Father "didn't get along very well." She indicated that M.F. began seeing Father more regularly, e.g., every weekend or every other weekend, after Mother and the children moved to Maple Heights. After M.F.'s allegations of sexual abuse were reported to the police, M.F. lived with Father.

{¶ 17} Mother testified that she had not wanted to believe the allegations against Washington were true because, at the time, she loved him. She stated that the allegations were "a shocker, like it caught me off guard." She indicated, however, "if they have proof that it's true, it's true."

{¶ 18} In May 2020, Kashiff Moore was a patrol officer for the Maple Heights Police Department. He testified that on May 3, 2020, he responded to a report of sexual assault of a minor at an address on Turney Road in Maple Heights.

Upon arrival, he and two other officers met with Mother and Washington and Mother signed a written consent form authorizing the officers to search the house.

{¶ 19} Moore testified that while using a black light to search for bodily fluids, the officers found a plastic bag in the closet of M.F.'s bedroom containing blue girl's underwear, blue jeans and a t-shirt that appeared to have bodily fluids on them. The officers collected the clothing, placed the clothing into paper bags, sealed and labeled the bags and entered them into evidence. Moore stated that no bodily fluids were found on the couch in the living room or on the bed, bedding or sleeping mat in M.F.'s bedroom.

{¶ 20} Moore identified the clothing taken by the officers, including State exhibit No. 12, marked as "panties worn during the incident," and copies of photographs of the clothing and M.F.'s room and closet, which were also marked as exhibits.

{¶ 21} Moore testified that a DNA buccal swab was voluntarily collected from Washington. He stated that his partner spoke with Washington and that Washington denied that he had sexually abused M.F.

{¶ 22} Moore testified that, later that day, he collected M.F.'s sexual assault evidence collection kit from Hillcrest Hospital and brought it to the Maple Heights police station where it was entered into evidence and placed in an evidence storage locker.

{¶ 23} At the time of trial, M.F. was 12 years old and in the 5th grade. She then lived with Father, her father's girlfriend, C.S., and her four-year-old half-

brother. M.F. identified Washington in court as her mother's boyfriend, whom she called "Big Phil." She testified that she had lived with Washington most of her life, that he was "kind of like a stepdad" to her and that he would do "stepdad things" for her and her siblings, e.g., cook dinner, take her to the store and buy things for her. She stated that Washington would be in charge when Mother was not home and that she would get in trouble with Mother if she did not follow his rules.

{¶ 24} M.F. testified that one day in May 2020, while she was at her paternal grandmother's house, she began crying and became "really upset" while Father and C.S. were out grocery shopping. She stated that she was "feeling sad" because she did not want to go back to Mother's house, where she lived with Mother, her siblings and Washington. When Father and C.S. returned, they noticed that M.F. was upset, and Father asked her what was wrong. M.F. did not tell Father why she was upset but, later, when she was alone with C.S., disclosed to C.S. that Washington had been "like touching on me and stuff." M.F. indicated that C.S. had initiated the conversation and had specifically asked M.F. (1) whether someone had been touching her and (2) whether that person was Washington.

{¶ 25} M.F. testified that she then spoke with a Cleveland police officer, Maple Heights police officers, a nurse at the hospital and "another lady" (later identified as CCDCFS worker Tabitha Mazza) about what Washington had done to her. M.F. stated that, in each instance, no one told her what to say and that she used "[m]y words" and not "other people's words" to describe what had occurred. M.F.

indicated that when she was questioned by police, Father and C.S. were in the room with her and "kind of [gave] some answers too."

{¶ 26} M.F. stated that she told the nurse at the hospital about "the last time" Washington assaulted her. She testified that while she was on the living room couch watching television, Washington "like touched me and stuff." Upon further questioning, she explained:

> Q. * * * What do you mean touched you and stuff? * * * Did he touch your private parts?
>
> A. Yes.
>
> Q. What private parts did he touch?
>
> A. My butt.
>
> Q. And did he touch any other private parts?
>
> A. Yeah.
>
> Q. What private parts did he touch?
>
> A. My private.
>
> Q. And did he use his hand, or did he use something else?
>
> A. Something else. And his hand.
>
> * * *
>
> Q. Okay. So he touched your butt with his hand, and he touched your private part with his hand?
>
> A. He — he didn't touch my private part with his hand, but he did touch my butt with his hand.
>
> * * *

Q. Did he use his hands to touch any other parts of your body, if you remember?

A. I don't remember.

Q. Okay. Now, did his private part touch you anywhere?

A. Yes.

Q. And where did his private part touch you?

A. My butt.

Q. Okay. And I'm sorry we have to ask you, [M.F.], okay? Are you talking about the outside of your butt or somewhere else?

A. Um — somewhere else.

Q. What's that somewhere else?

A. In.

Q. Did you say in your butt?

A. Yes.

* * *

Q. And this happened on the couch, where he put his private part in your butt; is that right?

A. Yes.

Q. And when he was doing that, was he touching you anywhere else?

A. Yes.

Q. Where else was he touching you?

A. My private part.

Q. And did he do anything else to you that you remember that you didn't like?

A. He licked my private part.

* * *

Q. Did he also — do you know if anything came out of his private part?

A. I don't know.

Q. Okay. Do you know if he put anything on his private part?

A. Yeah.

Q. What did he put on his private part?

A. Like some grease or something.

Q. Okay. And this last time, right, I asked a question if anything had came out of his private part. You're not sure if it did or not?

A. I think so.

Q. Okay. Had you ever seen anything come out of his private part before?

A. Yeah.

Q. And what did it look like?

A. It was like white.

{¶ 27} M.F. testified that while this was happening, she was feeling sad and started crying. She stated that Washington stopped because she was crying and that he was mad she was crying. She testified that after Washington stopped, she went into the bathroom and cleaned up and then put the clothes she had been wearing in her bedroom closet.

{¶ 28} M.F. testified that, after speaking with the nurse at the hospital, she told another woman more about what Washington had done to her. M.F. identified a copy of a photograph (State exhibit No. 10) in which she was talking to the woman and proceeded to describe what she told the woman (i.e., Mazza).

{¶ 29} M.F. testified that she told Mazza that when she lived on Clearaire Avenue, she had been in her bedroom at night sleeping with her younger sisters when Washington "put his private part in my butt." M.F. stated that, when he did this, it made her feel "weird." She indicated that Washington did not touch her anywhere else at that time.

{¶ 30} M.F. stated that Washington did "the same thing" a second time when she was living on Clearaire Avenue, i.e., that she was in her bedroom at night sleeping with her sisters when Washington "put his private part in my butt." In both instances, M.F. saw "white stuff" come out of "his private." In neither of these instances did Washington tell M.F. anything.

{¶ 31} M.F. testified that she also told Mazza about incidents that occurred when she lived on Alice Avenue and Turney Road. M.F. stated that when she lived on Alice Avenue, Washington "put his private part in my butt and touched my chest." M.F. indicated that Washington put "grease" on his private part and that she saw "the same" "white stuff" come out of "his private." M.F. testified that she told the police that, when these incidents occurred, the "white stuff" got "all over the couch," on the bed and on her.

{¶ 32} After they moved to Turney Road, M.F. stated that she was in her room with her sisters at night when Washington "put his private part in my butt and touched my private part and my butt." According to M.F., the final incident was the incident she had previously described to Lott, i.e., where Washington "put his private part in my butt and licked my private part" while she was on the couch in the living room in their house on Turney Road. M.F. testified that during these incidents, Washington was "very" quiet and was not loud enough to wake Mother or her sisters.

{¶ 33} When asked whether Washington had ever "put his private part in your private part," M.F. replied that he had but that she did not remember when or where that occurred other than "probably like Turney, maybe." When asked whether Washington ever made her touch his private part, M.F. responded that he had made her "suck his private part."

{¶ 34} M.F. testified that, at some point, perhaps "at the Turney house," Washington told M.F. not to tell anyone about the incidents. She stated that she did not believe Washington told her what would happen if she told anyone. M.F. acknowledged that Mother had previously asked her "if anything was going on" or "if anybody was doing anything to you," but stated that she never told Mother what Washington was doing to her because she was afraid Mother would tell Washington what M.F. had said.

{¶ 35} Father testified that, in May 2020, he was "just starting to see [M.F.] again" and was trying to build a relationship with her. He stated that, at this time,

he would see M.F. "[n]ot that often," [f]or the weekend, possibly," and that when M.F. visited, his mother, his other kids and sometimes C.S. "would be around." Father stated that, in addition to M.F., he had three other children ages 16, 12 and 4. He stated that he had been in a relationship with C.S. for six or seven years.

{¶ 36} Father said that M.F. would be dropped off at his mother's house for visitation because he and Mother "didn't have no dealings," i.e., "[w]e didn't want to be around each other," and there were "some issues" between Mother and C.S. because Mother did not want M.F. to think that C.S. was her "new mom."

{¶ 37} Father testified that M.F. was dropped off for visitation on Friday, May 1, 2020. On the afternoon of May 2, 2020, when he and C.S. were returning to his mother's house after grocery shopping, Father saw M.F. "balled up in a corner, crying." Father stated that he asked M.F. what was wrong, but that M.F. would not talk to Father. He indicated that C.S. took M.F., who was still crying, to the car to speak with her privately. After C.S. told Father what M.F. had disclosed to her, they went first to a Cleveland police station and later to the Maple Heights police station, where they made police reports.

{¶ 38} Father testified that, at the Cleveland police station, a police officer "pulled [M.F.] into a separate room and interviewed her" and that, at the Maple Heights police station, the three of them met with a police officer together and then wrote out a statement. Father stated that neither he nor C.S. told M.F. what to say.

{¶ 39} Father and C.S. next took M.F. to the hospital, where he told a nurse what he knew. Father explained that, at that point, "I didn't know too much. I knew

something wasn't right, something, you know, the main objective. I didn't know exactly the details, and everything, but I knew it was something. I told her [M.F.] was assaulted * * * [s]exually." Father stated that he was not in the room when the nurse examined M.F. and that, when M.F. later spoke with a social worker, the social worker "pulled [M.F.] to the side" when talking to her. Father denied telling M.F. what to say and testified that M.F. never disclosed to Father the details of what had occurred.

{¶ 40} Father stated that M.F. had been living with him since May 2, 2020 but that she maintains a relationship with Mother and speaks with her regularly, "[p]ossibly every day." He indicated that, at the time of trial, M.F. was participating in weekly counseling sessions through the Rape Crisis Center. Father testified that M.F. does not talk about what happened at home but that he had begun to notice positive changes in M.F., e.g., isolating less, talking more and not "sad all the time."

{¶ 41} C.S. testified that she has two children, ages nine and four, that she met Father seven or eight years ago, and they had been together for approximately six years. C.S. stated that she first met M.F. in 2016 and that she "look[ed] at [M.F.] like my own daughter."

{¶ 42} C.S. testified that, in early May 2020, after she and Father went grocery shopping, she observed M.F. "down and sad in a corner," which was unusual for M.F. She stated that she asked M.F. what was wrong and M.F. would not respond, so she took M.F. to the car to talk to her privately. C.S. testified that M.F.

was crying; "[s]he was like so sad"; "[y]ou could tell, look in her face that something was bothering her."

{¶ 43} C.S. testified that she asked M.F., "what was wrong," "was somebody hurting you down there, which is — the private part area" and whether it was Washington. C.S. explained that she had "been through the same thing," i.e., "[m]y mom's boyfriend messed with me when I was younger, and I — I knew it was probably that."

{¶ 44} C.S. testified that she told Father what M.F. had disclosed to her, and they went to the police — first to a Cleveland police station, then to the Maple Heights police station — to make a police report. They then went to the hospital.

{¶ 45} David Ross ("Ross"), a forensic scientist in the forensic DNA section of the Ohio Bureau of Criminal Investigation ("BCI" or "the lab"), was established as an expert in DNA and forensic biology. He testified regarding testing that was done on evidence collected in the case, which included both serology testing (i.e., testing for bodily fluids) and DNA extraction and testing. Ross indicated that the lab received the following evidence for testing: M.F.'s rape kit (State exhibit No. 9), girl's white underwear, blue girl's underwear worn during the incident (State exhibit No. 12), a white t-shirt worn during the incident (State exhibit No. 13), blue jeans worn during the incident (State exhibit No. 14) and two buccal swabs containing a DNA standard for Washington (State exhibit No. 11). Ross also identified copies of reports he had generated on June 9, 2020 and on January 4, 2021 (State exhibit Nos. 6 and

7) and discussed the forensic testing he conducted on the evidence as set forth in his reports.

{¶ 46} Ross' testimony focused largely on the results of testing conducted on the blue underwear. Ross testified that he first viewed the blue underwear under an alternate light source, "basically a black light," to identify and mark areas "stained" by bodily fluids. A color-change test then was performed to test for the presence of acid phosphatase, an enzyme or a protein found in high concentrations in semen. Areas of color change guided where samples were selected for further testing for sperm cells and DNA analysis.

{¶ 47} Ross testified that a cutting or swabbing was taken from a stained area of the underwear, placed into a tube with water and "basically beat up" in an attempt to extract cellular material from the sample. A small amount of fluid was then removed from the tube, placed on a slide and examined under a microscope. Ross testified that although a prostate specific antigen test performed on the sample was "presumptive positive for seminal fluid," when the sample was examined under the microscope, no sperm cells were identified. Ross indicated that this did "not necessarily" mean no sperm cells were present on the underwear. He explained semen is "not homogenous," i.e., it has a liquid component and a cellular component and is "not evenly mixed," and the results simply indicated that there were no sperm cells in the small sample taken.

{¶ 48} With respect to the DNA analysis conducted on the blue underwear, Ross testified that where, as here, semen may be present in a sample, they use an

extraction method to attempt to separate sperm cells from other potential sources of DNA, e.g., epithelial (skin) cells. Chemicals are placed into a tube with the sample and "will sort of break open, burst open all the weaker, softer cells, and all of that DNA is left floating in that solution." Those chemicals, however, "don't break open the sperm cells since they're harder and they're tougher, [s]o all the sperm cells are left intact and separate[] from all that DNA." The tube is spun "really fast," so that "all of that DNA stays suspended in that fluid, and if there's any sperm cells in that sample, presumably they're at the bottom of the tube in a little pellet." The "fluid with all the other DNA" is extracted from the tube, "leaving only that pellet of sperm cells." Harsher chemicals are then added to break open the presumed sperm cells. What remains is (1) a "sperm fraction," consisting of DNA that is "presumed" to be from sperm cells, and (2) the "nonsperm fraction, or epithelial fraction," consisting of DNA from "soft cells," i.e., skin cells, vaginal secretion cells, white blood cells, "anything that has a soft cell membrane." On cross-examination, Ross acknowledged that it could be "considered misleading" or "confusing" to use the term "sperm fraction" because it was not, in fact, confirmed that any sperm was in that fraction, i.e., "no sperm cells were identified on the sample where the sperm cell DNA would be."

{¶ 49} Ross testified that a swab of stained areas in the interior crotch and rear panel of the blue underwear revealed a DNA mixture of two individuals, M.F. and an unknown contributor. When compared with Washington's DNA from the buccal swab, the DNA profile from the unknown contributor was determined to be

"consistent" with Washington and "rarer than one in one trillion unrelated individuals," i.e., in a population of over a trillion people, that DNA profile would be expected one time. Ross further testified that the DNA profile that was consistent with Washington was in the "sperm fraction."

{¶ 50} Ross testified that a swab taken from the remainder of the interior of the blue underwear ("everywhere that there isn't [a] visibly stained area") resulted in a "mixture of more than two individuals" with two major DNA contributors. One of the major DNA contributors was consistent with M.F. The other was consistent with Washington and, once again, was "rarer than one in one trillion unrelated individuals" and was in the "sperm fraction." Ross could not make any conclusions as to who or how many people contributed to the other "low level" DNA found in this sample but indicated that it was "not uncommon" to have "low level DNA profiles like that on any kind of clothing sample" because "[c]lothing is handled quite a bit more" and "there is a lot of potential transfer of very low level DNA skins cells, skin oil, anything like that."

{¶ 51} Ross testified that M.F. was the only major DNA contributor who could be identified in a sample taken from the exterior stained area of the blue underwear; Washington was "excluded as the major contributor" and no conclusions could be drawn as to the other "low levels" of DNA present. A swab from the remainder of the exterior of the blue underwear ("wherever there was no visible staining") included DNA consistent with Washington with a rarity of "1 in 60

million unrelated individuals," DNA consistent with M.F. and other "low level" DNA as to which no conclusions could be drawn.

{¶ 52} On cross-examination, Ross acknowledged that he could not say, based on the testing he had performed, that Washington's sperm was found on M.F.'s blue underwear, only that Washington's DNA was found on the underwear. Russ further acknowledged that he could not determine how Washington's DNA got on her underwear.

{¶ 53} With respect to the samples collected in the sexual assault evidence collection kit, Ross testified that as to the hymen and perianal samples, the samples tested positive for acid phosphatase activity (i.e., indicating the possible presence of semen), but no DNA profile foreign to M.F. was found. He indicated that oral samples and samples taken from the external genitalia were likewise positive for acid phosphatase activity, but no DNA analysis was conducted of those samples or of the pubic hair combings or fingernail samples that had been collected. Ross testified that the skin swabs and the jeans and white underwear police collected tested negative for acid phosphatase activity and that no testing was conducted on the t-shirt police collected.

{¶ 54} Ross stated that his conclusions, as set forth in his reports, were based on his education, training and experience and were made to a reasonable degree of scientific certainty.

{¶ 55} Mazza, a child protective service worker in CCDCFS's sex abuse unit, conducted a forensic interview of M.F. at the agency's child advocacy center on

May 26, 2020. She described the interview as "non-leading narrative questioning for survivors of abuse or neglect with developmentally appropriate questions for the child."

{¶ 56} Mazza testified that, during the interview, M.F. disclosed that she had been sexually assaulted by Washington on multiple occasions as follows:

- When she was living on Clearaire Avenue in Cleveland, Washington came into M.F.'s bedroom while she was in bed with her sisters and "touched her on her private[,] chest and bottom area" and "put his private inside of her butt." She saw "white stuff" "coming from his private."

- When she was living on Clearaire Avenue in Cleveland, "the same thing happened" a second time, i.e., Washington came into M.F.'s bedroom and "put his private in her butt." She described it as "feeling hard."

- At "another house," at "a location that she didn't know," Washington came into the room and "touched [M.F.] on her chest and rubbed her on her butt and also put his private in her butt."

- While living in Maple Heights, Washington came into the room, "rubbed her" and "put his private part in her butt and her private part." During this time she "felt something on her" "like grease" that was from "a clear container."

- M.F. was on the couch in the living room. Washington "came in, told her to take her pants off and put his private in her butt." He "used the grease stuff." "When he was done," he "went on his phone, and then he left." M.F. "cleaned herself up" in the bathroom. (According to Mazza, this was the "last incident" that M.F. had first disclosed to C.S.)

{¶ 57} Mazza testified that, following the interview, CCDCFS referred M.F. for a medical examination and for counseling services at the Cleveland Rape Crisis Center. She stated that Mother had agreed to allow M.F. to live with Father. Mazza

indicated that six other children were living in Mother's home at that time and that, after interviewing and assessing the children, there was no indication Washington had sexually abused or had otherwise done anything inappropriate to any of the other children.

{¶ 58} Richard Tusing, who was then a detective in the Cleveland Police Department's sex crimes and child abuse unit, was assigned to investigate M.F.'s allegations against Washington. He testified that he "linked up" with Mazza and contemporaneously observed the interview Mazza conducted of M.F. (over a monitor in a separate room so M.F. did not know he was observing the interview). Tusing stated that he generally conducts joint interviews with social workers so that a child is interviewed only once to avoid the "risk of retraumatizing" the child. After the interview, Tusing obtained the police reports relating to M.F.'s allegations and reached out to the Maple Heights detective assigned to the case to determine the status of its investigation. Tusing thereafter "took the lead" on the case, issued a warrant for Washington, interviewed Washington, watched a recorded interview of M.F. conducted by Cleveland police and initiated charges. Although he was aware that Maple Heights police had also conducted an interview of M.F. prior to his involvement in the case, he did not watch the recording of the interview Maple Heights police conducted.

{¶ 59} In addition to witness testimony, the state introduced the consent-to-search signed by Mother, copies of photographs of M.F.'s bedroom, bedroom closet, the clothing collected by police and Mazza's interview of M.F., reports of the testing

conducted by Ross, M.F.'s medical records from the SANE examination, the sexual assault evidence collection kit, the buccal swabs containing Washington's DNA sample and M.F.'s blue underwear, t-shirt and blue jeans — all of which was admitted into evidence without objection.

{¶ 60} At the conclusion of the state's case, Washington moved for acquittal on all counts pursuant to Crim.R. 29 based on the lack of specificity regarding the sexual crimes and the timeframes during which they allegedly occurred. The trial court granted the motion as to Counts 6 and 8, concluding that there was insufficient evidence of vaginal penetration. The trial court also granted the state leave to amend Count 9 to refer only to the touching of M.F.'s vagina and to delete references to touching her butt and chest.

{¶ 61} Washington then testified in his defense. Washington testified that he and Mother had a nine-year-old son together and that they had been together "off and on" for nine or ten "good" years. He stated that he had known M.F. since she was approximately one year old.

{¶ 62} Washington testified that he began living with Mother and her children in 2011 at a home on East 105th Street and Barrett Avenue in Cleveland and that they moved to Clearaire Avenue in 2015. Washington indicated that he was incarcerated for a parole violation between June 2018 and December 5, 2018 and that when he got out of prison, he stayed at a shelter, lived with his sisters and then lived with a roommate. Washington stated that he was not in contact with Mother during this time period because Mother had rekindled her relationship with Father

and that Washington, therefore, never lived, visited or stayed over at the Clearaire Avenue residence after his release from prison.

{¶ 63} Washington testified that in February 2019, when Mother and her children lived at the Alice Avenue residence, he started talking to her again and "stayed a couple nights" there. He indicated that he began spending more time with the family beginning in May 2019, staying with them "off and on." In the summer of 2019, Washington moved Mother and her children to Maple Heights. Washington testified that, at that time, his relationship with both Mother and M.F. was "excellent" and that, to his knowledge, M.F. liked and loved him. Washington stated that he never disciplined M.F.; Mother disciplined her.

{¶ 64} Washington testified that he was a "father figure" and acted like a "dad" to all of Mother's children, "taking them to school, fixing them something to eat, doing [their] laundry, * * * taking them to the park, going out to eat * * * just doing things with them as a family." Washington stated that M.F. never called him "dad" because "[s]he knew who her dad was."

{¶ 65} Washington testified that when the police showed up to investigate allegations that he had sexually assaulted M.F., he was "surprised." He explained:

> I was just overwhelmed, you know. Just I don't know what to expect. It was just very — I was like ashamed. I just felt bad. I just felt bad. I felt like, you know, felt bad, man. * * * Because I knew, you know — just knew what it was about, you know. I just knew that this was some type of — it was just a situation where I probably didn't want to actually deal with. It was just I couldn't deal with it, you know. It was very upsetting. It was very upsetting, you know. * * * I was in bed, you know. I wasn't expecting that, you know. I never — that never happened to me in my life. I wasn't expecting that.

**{¶ 66}** When asked whether he knew whether police "were going to find [his] DNA in [M.F.'s] underwear," Washington replied, "[M]y DNA is everywhere" and "is on all the clothing" because "I do laundry and wash clothing, all that." When asked whether he knew whether police "were going to find a stain of [his] DNA in [M.F.'s] underwear," Washington replied, "I guess." He explained that when the police showed up in the middle of the night, he knew "it was going to be some bulls***," "I just knew it was something going on. It was something that was out of the ordinary."

**{¶ 67}** Washington testified that, at the request of police, he gave a statement, provided a DNA sample and allowed the police to search his home, take pictures and talk to the other children. Washington denied ever touching or doing anything inappropriate to M.F. or any of Mother's other children and stated that he loved Mother and all her children. Washington testified that when he learned that M.F. had alleged he raped her, he "didn't know what to think." "It was just crazy. It was just crazy. I didn't know how to react to that."

**{¶ 68}** At the conclusion of Washington's testimony, he renewed his motion for acquittal. The trial court denied the motion.

**{¶ 69}** Before the case was submitted to the jury, the trial court renumbered the counts, i.e., Count 7 became Count 6, Count 9 became Count 7, Count 10 became Count 8, Count 11 became Count 9 and Count 12 became Count 10.

**{¶ 70}** The jury found Washington guilty on all of these counts, i.e., anal rape in violation of R.C. 2907.02(A)(1)(b) in Counts 1, 3, 4, renumbered Count 6, renumbered Count 9 and renumbered Count 10[3] and gross sexual imposition in violation of R.C. 2907.05(A)(4) in Counts 2, 5, renumbered Count 7 and renumbered Count 8 of the indictment.[4] The trial court found Washington guilty of the notice-of-prior-conviction and repeat-violent-offender specifications as charged in Counts 1, 3, 4, renumbered Count 6, renumbered Count 9 and renumbered Count 10.

**{¶ 71}** The trial court sentenced Washington to life in prison without the possibility of parole on Counts 1, 3, 4, renumbered Count 6, renumbered Count 9 and renumbered Count 10 (the rape counts).[5] The trial court imposed five-year

---

[3] As charged in the indictment, Counts 11 and 12 (renumbered as Counts 9 and 10) involved rape of a child "who was under thirteen years of age but ten years of age or older at the time of the commission of the offense." However, the jury verdict form for renumbered Count 9, which lists an incident date of "on or about March 22, 2020," included a "further finding" by the jury that "at the time of the offense[,] the victim, [M.F.], was less than 10 years of age, to wit: DOB 1/19/2010." The jury verdict form for renumbered Count 10, which lists an incident date range of "on or about March 22, 2020 to May 2, 2020," similarly included a "further finding" by the jury that "at the time of the offense[,] the victim, [M.F.], was less than 10 years of age, to wit: DOB 1/19/2010." No objection was raised below to the verdict forms, to the jury's verdicts or findings or to the sentences imposed based on those verdicts and findings. Because the issue has not been raised on appeal, we do not further address it here.

[4] In its April 27, 2022 sentencing journal entry, the trial court states, "The jury returns a verdict of not guilty of gross sexual imposition [R.C.] 2907.05(A)(4) F3 as charged in Count(s) 2 of the indictment," but, nevertheless, sentenced Washington on that count. The parties assert in their appellate briefs that the jury acquitted Washington on that count. However, the trial transcript and the signed verdict forms reveal that the jury found Washington guilty on that count.

[5] Although the trial court imposed prison sentences on all counts in its April 27, 2022 sentencing journal entry, the trial court did not impose prison sentences on renumbered Count 6, renumbered Count 9 or renumbered Court 10 at the sentencing hearing. At the sentencing hearing, the trial court stated:

prison sentences on Counts 2, 5, renumbered Count 7 and renumbered Count 8 (the gross sexual imposition counts). It ordered that the sentences on all counts be served consecutively and designated Washington as a Tier II and Tier III sex offender/child offender.

{¶ 72} Washington appealed, raising the following six assignments of error for review:

> Assignment of Error I:
> The trial court erred in entering convictions for rape with allegation of force which were not supported by sufficient evidence, in violation of defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.
>
> Assignment of Error II:
> The appellant's right to due process of law and a fair trial was violated by repeated references to the complainant as the "victim" by the court, the prosecutor and witnesses, all in violation of the rights guaranteed by the Sixth and Fourteenth Amendments.
>
> Assignment of Error III:
> The verdicts finding the appellant guilty of rape were against the manifest weight of the evidence.
>
> Assignment of Error IV:
> The trial court erred in failing to properly charge the jury relative to the elements of force required under Ohio law and the failure to do so is plain error.

---

Well, Count 1 of course is life without parole. Count 2 is 5 years, 1 to 5 years. * * * Count 3 is also life without parole as is Count 4, and I think that's it.

Gross sexual imposition, the Court would sentence the Defendant to the maximum of five years on those cases. The Court would run those consecutive if something happens to the other counts on appeal.

No objection was raised to Washington's sentences below. Once again, because the issue has not been raised on appeal, we do not further address it here.

Assignment of Error V:
The appellant was deprived of his right to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution.

Assignment of Error VI:
A sentence of life without the possibility of parole constitutes cruel and unusual punishment in violation of Art. I, Sections 9, 10 and 16 of the Ohio Constitution and the Eighth and Fourteenth Amendments to the U.S. Constitution.

{¶ 73} For ease of discussion, we review Washington's assignments of error out of order and together where appropriate.

**Law and Analysis**

**Jury Instructions Regarding "Force"**

{¶ 74} In his fourth assignment of error, Washington contends that the trial court failed to properly instruct the jury "relative to the elements of force" on each of his rape counts.[6]

---

[6] In his appellate briefs, Washington asserts that the jury's finding of force "triggered" his "life sentence." Appellant's Br. at 15, 26, 29; Reply Br. at 2-3. However, the jury's verdicts on each of the rape counts of which Washington was convicted included a finding (which Washington has not challenged on appeal), that the victim was under the age of 10 at the time of the commission of the offense. If there had been no finding of force, for each rape offense, the trial court would have had the option of sentencing Washington to 15 years to life in prison under R.C. 2971.03(B)(1)(b) or to life without parole under R.C. 2907.02(B) for the rape of a victim under the age of 10. *See also State v. Bowers*, 163 Ohio St.3d 28, 2020-Ohio-5167, 167 N.E.3d 947, ¶ 3, 5, 23; *State v. Johnson*, 8th Dist. Cuyahoga No. 109127, 2020-Ohio-2947, ¶ 8-14; *State v. White*, 1st Dist. Hamilton No. C-190589, 2021-Ohio-1644, ¶ 104. Based on the jury's further finding of force, for each rape offense, the trial court had the option of sentencing Washington to 25 years to life in prison under R.C. 2971.03(B)(1)(c) or to life without parole under R.C. 2907.02(B). *Bowers* at ¶ 16-17, 19-21. Given that the trial court sentenced Washington to life without parole and had the authority to do so under R.C. 2907.02(B) even in the absence of a finding of force, Washington's "force" arguments in his first, third and fourth assignments of error would appear to be moot. However, even if we were to consider Washington's "force" arguments, for the reasons set forth below, they are meritless.

{¶ 75} Crim.R. 30(A) states, in relevant part: "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Under Crim.R. 52(B), however, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Washington did not object to the trial court's jury instructions below. Accordingly, he has forfeited all but plain error.

{¶ 76} Plain error is an obvious error or defect in the trial court proceedings that affects a substantial right. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. Plain error requires a showing that there was an error, that the error was plain or obvious, that but for the error the outcome of the proceeding would have been otherwise and that reversal is necessary to correct a manifest miscarriage of justice. *State v. Buttery*, 162 Ohio St.3d 10, 2020-Ohio-2998, 164 N.E.3d 294, ¶ 7, citing *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16. The party asserting plain error "bears the burden of proof to demonstrate plain error on the record." *Rogers* at ¶ 22, citing *Quarterman* at ¶ 16.

{¶ 77} In considering a claim of plain error based on defective jury instructions, "an appellate court must review the [jury] instructions as a whole and the entire record to determine whether a manifest miscarriage of justice has occurred as a result of the error in the instructions." *State v. Wamsley*, 117 Ohio St.3d 388, 2008-Ohio-1195, 884 N.E.2d 45, ¶ 17. An improper or erroneous jury

instruction does not constitute plain error unless, but for the error, the outcome of the trial would clearly have been different. *State v. Davis*, 8th Dist. Cuyahoga No. 109890, 2021-Ohio-2311, ¶ 30, citing *State v. Cooperrider*, 4 Ohio St.3d 226, 227-228, 448 N.E.2d 452 (1983). We find no such error here.

{¶ 78} In this case, each rape count included a furthermore clause alleging that "the defendant purposefully compelled the victim * * * to submit by force or threat of force." With respect to the "force" element, the trial court instructed the jury, in relevant part, as follows:

> If your verdict is guilty, you will separately decide beyond a reasonable doubt whether the Defendant purposely compelled [M.F.] to submit by force or threat of force. * * *
>
> Force means any violence, compulsion or constraint physically exerted by any means upon or against a person or things.
>
> When the relationship between the victim and the Defendant is one of child and pseudo step-father and/or mother's boyfriend, the element of force need not be openly displayed or physically brutal. It can be subtle, slight, psychologic, emotionally powerful. Evidence of an express threat of harm or evidence of significant physical restraint is not required. If you find beyond a reasonable doubt that under the circumstances in evidence the victim's will was overcome by fear or duress or intimidation, the element of force has been proved.
>
> Threat includes a direct and indirect threat.

Tr. 702, 704-705.

{¶ 79} Washington contends that the trial court's jury instructions regarding the issue of "force" were "incomplete," that the trial court "[e]ssentially" instructed the jury that "to satisfy the element of force they need only find there was a parent-child relationship" and that, pursuant to the Ohio Supreme Court's decision in *State*

*v. Dye*, 82 Ohio St.3d 323, 695 N.E.2d 763 (1988), "more was required," i.e., the trial court needed to instruct the jury that "in addition to the parent-child relationship[,] it must be shown that that relationship cause[d] the victim's will to be overcome by fear or duress," "not just" that fear, duress or intimidation "may be inferred once the [parental or pseudo-parental] relationship is established." We disagree.

{¶ 80} In support of his argument, Washington cites — not to the trial court's jury instructions, but to the state's closing argument — and asserts that "[t]he prosecutor's legally incorrect definition led the jury to believe that they had only to find the relationship." Again, Washington did not object to the statements by the assistant prosecuting attorney at trial.

{¶ 81} The trial court repeatedly instructed the jury that it is "[t]he trial judge" who "instructs the jury as to the law governing the case" and that it is "the function of the jury to decide the facts, apply the law received from the trial judge to those facts, and then determine the guilt or non-guilt of the accused." Tr. 115-116; *see also* tr. 126-127 ("You may not apply Judge Judy's law, CSI, Law & Order or any other source of law other than this Court. You must apply the law as the Court states it to be."); Tr. 128 ("[T]his case must be decided solely from the evidence presented in this Court and the law, as the Judge states the law to be."); Tr. 687-688 ("You decide the disputed facts and the Court provides the instructions of law. These instructions are to be taken, or read, as a whole. It is your sworn duty to accept these instructions and apply the law as it is given to you * * * apart from any notion or opinion of any kind * * * which you may have as to what the law is or what the law

ought to be in the particular case."); Tr. n718 ("The rules of law which are explained to you in these instructions are binding upon the individual conscience and judgment of each member of the jury."). We presume that the jury followed the trial court's instructions. *See, e.g., State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 147; *State v. Wilson*, 8th Dist. Cuyahoga No. 111814, 2023-Ohio-1046, ¶ 19, citing *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 147; *State v. Jackson*, 8th Dist. Cuyahoga No. 111602, 2023-Ohio-455, ¶ 45. Accordingly, even if the assistant prosecuting attorney had misstated the law, Washington has not shown that it impacted the jury's verdicts here.

{¶ 82} In *Dye*, 82 Ohio St.3d 323, 695 N.E.2d 763, the Ohio Supreme Court, applying its decision in *State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988), held that "a person in a position of authority over a child under thirteen may be convicted of rape of that child with force pursuant to R.C. 2907.02(A)(1)(b) and (B) without evidence of express threat of harm or evidence of significant physical restraint." *Dye* at 323, 329.

{¶ 83} In *Eskridge*, the Ohio Supreme Court had considered "whether there was substantial evidence presented at trial to prove that force or the threat of force was used in the commission of the rape" where a 28-year-old father had raped his four-year-old daughter but there were "no explicit threats or displays of force." *Eskridge* at 57, 59. In upholding the defendant's conviction, the court stated:

> "The force and violence necessary in rape is naturally a relative term, depending upon the age, size and strength of the parties and their relation to each other * * *. With the filial obligation of obedience to

the parent, the same degree of force and violence would not be required upon a person of such tender years, as would be required were the parties more nearly equal in age, size and strength." *State v. Labu*, 102 Ohio St. 26, 38-39, 130 N.E. 161 (1921). * * *

We also recognize the coercion inherent in parental authority when a father sexually abuses his child. "* * * Force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established. * * * In the within case, we are confronted with a child being told to do something by an important figure of authority, and commanded not to tell anyone about it. In such a case, we find nothing unreasonable about a finding that the child's will was overcome. Consequently, the forcible element of rape was properly established." *State v. Fowler*, 27 Ohio App.3d 149, 154, 500 N.E. 2d 390 (8th Dist.).

* * *

The youth and vulnerability of children, coupled with the power inherent in a parent's position of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose.

*Eskridge* at 58-59.

{¶ 84} In *Dye*, the Ohio Supreme Court extended its holding in *Eskridge* to a person who was not the parent of the young child victim but who stood in a position of authority over the victim. In *Dye*, a 9-year-old victim had been sexually assaulted by a 44-year-old friend of the victim's mother, who had known the defendant for many years and with whom the child had maintained a close relationship, visiting and staying at the defendant's residence approximately once a week. *Dye* at 328. The court found that there was sufficient evidence of "force" based on the age and size disparity between the victim and the offender and the psychological force arising out of the defendant's position of authority over the young victim and the

defendant's statements to the victim that he should keep the abuse secret. *Id.* at 328-329. The court explained:

> "*State v. Eskridge* is based solely on the recognition of the amount of control that parents have over their children, particularly young children." [*State v. Schaim*, 65 Ohio St.3d 51, 55, 600 N.E.2d 661 (1992)]. We concluded that "because of the child's dependence on his or her parents, a child of tender years has no real power to resist his or her parent's command, and every command contains an implicit threat of punishment for failure to obey." *Id.*
>
> We recognize that it is nearly impossible to imagine the rape of a child without force involved. * * * Yet '"force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.'" *Eskridge*, 38 Ohio St.3d at 58-59, 526 N.E.2d at 306, [quoting *Fowler* at 154]. * * *
>
> In the present case, * * * [t]he defendant was a five-foot, nine-inch, one-hundred-thirty-five-pound man, while David was an approximately seventy-seven-pound child. * * * In the present case, nine-year-old David was forced to submit to the authority of a forty-four-year-old man who was not his parent, but who stood in a position of authority over him. David's mother had known the defendant for seven years and David had maintained a close relationship with the defendant over that time, visiting and staying at the defendant's residence approximately once a week. David considered the defendant to be his friend until these events occurred. Clearly, the defendant was an important figure of authority in David's life. In addition, * * * the defendant told David to keep the sexual abuse a secret.
>
> Most important, when David's mother dropped David off at the defendant's residence or when the defendant picked David up and took him to his home, David's mother told him to mind the defendant, and not to aggravate him, or she would come and pick him up or the defendant would bring him home. * * * When parents tell their children that the caregiver is in charge and that the children should mind the caregiver, that caregiver occupies the same position of authority as the parent traditionally would.

*Dye* at 327-329.

{¶ 85} The trial court's jury instructions on "force" explain, consistent with Ohio law, that when a parental relationship or "pseudo-parental relationship" exists between an alleged victim and offender, "force" need not be direct, overt and physical and may instead be exhibited through a "subtle, slight, psychologic, emotional[] power[]." The jury instructions also make it clear that a finding of force is warranted only where the jury finds, beyond a reasonable doubt, that "the victim's will was overcome by fear or duress or intimidation": "If you find beyond a reasonable doubt that under the circumstances in evidence the victim's will was overcome by fear or duress or intimidation, the element of force has been proved."

{¶ 86} Washington did not offer below, and does not identify here, any additional or different "complete" jury instructions he contends the trial court should have given in this case. This court has previously reviewed instructions similar to the "force" instructions given to the jury in this case and has found that the instructions "comport[] with the definition of 'force' applied in * * * *Dye*." *See, e.g., State v. Milam*, 8th Dist. Cuyahoga No. 86268, 2006-Ohio-4742, ¶ 33-34; *see also State v. Musgrave*, 9th Dist. Summit No. 18260, 1998 Ohio App. LEXIS 5557, 7-9 (Nov. 25, 1998).

{¶ 87} We find no error, plain or otherwise, in the trial court's "force" instructions. Washington's fourth assignment of error is overruled.

**Sufficiency of the Evidence**

{¶ 88} In his first assignment of error, Washington argues that his rape convictions should be reversed because there was insufficient evidence of

"penetration" to support his convictions for anal rape (Counts 1, 3, 4, renumbered Count 6 and renumbered Count 10). He also contends that there was insufficient evidence of "force" to support the jury's findings that Washington compelled M.F. to submit by force or threat of force on all the rape charges (Counts 1, 3, 4, renumbered Count 6, renumbered Count 9 and renumbered Count 10).

{¶ 89} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state has met its burden of production at trial. *State v. Messenger*, Slip Opinion No. 2022-Ohio-4562, ¶ 26; *State v. Pierce*, 8th Dist. Cuyahoga No. 111605, 2023-Ohio-528, ¶ 16. Whether the evidence is legally sufficient to support a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 90} An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable juror of the defendant's guilt beyond a reasonable doubt. *Id.*; *see also State v. Bankston*, 10th Dist. Franklin No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). The appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'"

*State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 91} Washington was convicted of rape in violation of R.C. 2907.02(A)(1)(b). That provision states, in relevant part: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." In addition, the jury found, as to each count of rape, that Washington "purposely compelled" M.F. "to submit by force or threat of force."

{¶ 92} R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." "Penetration, however slight, is sufficient to complete vaginal or anal intercourse." *Id.*

**Evidence of Anal Penetration**

{¶ 93} Washington argues that to support his convictions for anal rape, i.e., to prove the element of "penetration, however slight," the state needed to prove beyond a reasonable doubt that Washington inserted his penis into M.F.'s anal cavity, i.e., "into the anus" not just on or into her "buttocks." He contends that there was insufficient evidence of anal penetration to support his convictions for anal rape

because (1) none of the witnesses specifically used the word "penetrated" or "penetration" in describing what Washington had done to M.F., (2) M.F.'s testimony and her statements to Lott and Mazza that Washington had put his penis "in" her butt did not establish "penetration" and (3) there was "no objective medical evidence to support the element of penetration for any of the counts charging anal rape." We disagree.

{¶ 94} In support of his arguments, Washington cites *State v. Wells*, 91 Ohio St.3d 32, 740 N.E.2d 1097 (2001), *State v. Remy*, 2d Dist. Clark No. 2017-CA-6, 2018-Ohio-2856, and *In re D.C.*, 2018-Ohio-163, 104 N.E.3d 121 (8th Dist.)

{¶ 95} In *Wells*, the Ohio Supreme Court analyzed the meaning of penetration of the "anal cavity," as used in former R.C. 2907.01(A), when "read together" with "anal intercourse."[7] *Id.* at 34. The court held that, as the "everyday

---

[7] Prior to August 3, 2006, R.C. 2907.01(A) defined sexual conduct as including the insertion, however slight, of any body part or object into the "vaginal or anal cavity of another." In 2005 H.B. No. 95, the General Assembly replaced the word "cavity" with the word "opening." *State v. Patterson*, 5th Dist. Tuscarawas No. 2020 AP 12 0025, 2021 Ohio App. LEXIS 2361, 8 (July 12, 2021); *State v. D.H.*, 10th Dist. Franklin No. 16AP-501, 2018-Ohio-559, ¶ 30. Although Washington's argument focuses on anal "cavity" as used in the prior version of the statute rather than anal "opening" as used in the version of the statute in effect when Washington allegedly committed the offenses at issue, no argument has been made that the difference in verbiage is material here. Accordingly, we need not determine whether penetration of the anal "cavity" is different from penetration of the anal "opening." *See State v. Leonard*, 8th Dist. Cuyahoga No. 98626, 2013-Ohio-1446, ¶ 34-39 (declining to address claim that "the term 'opening' implies a lesser form of penetration that includes the surface of buttocks only" than the term "cavity" where claim was not supported by any citations to authority and victim testified that defendant "stuck his penis in me" and "stuck [his penis] in my behind, sir. My anus," concluding that the evidence was "sufficient to show the element of sexual conduct under either term"). *But cf. Patterson* at 9 (observing, as it relates to the vagina, that "the term vaginal *cavity* would appear to require further penetration into the vaginal canal than the term vaginal *opening*") (emphasis sic); *D.H.* at ¶ 47 (observing that "as the court only provided the jury with the vaginal cavity definition without further explanation, the court arguably made the state's proof more difficult, as the

meaning of 'cavity' is 'a natural hollow place within the body,'" "penetration into the anal cavity occurs when some part of the body or any other item is inserted into the anus" and evidence that the defendant had "made contact only with the victim's buttocks" was not sufficient to prove anal rape.  (Emphasis deleted.)  *Id.* at 34-35, quoting *Webster's New World Dictionary* 224 (3d Ed.1991).

{¶ 96} Washington also cites to portions of the Second District's decision in *Remy,* which "clarif[ed] what evidence is legally sufficient to establish * * * anal penetration," as follows:

> "Rape, both vaginal and anal, requires intercourse involving penetration of a particular bodily cavity.  A 'cavity' is a hollow space within a mass.  *Webster's Third International Dictionary.*  Intercourse occurs with penetration of the cavity, 'however slight' that penetration may be.  R.C. 2907.01(A).  Evidence of penetration differs for these purposes, however, because there is a significant anatomical difference between those particular bodily cavities.

> Anal rape requires penetration of the anal cavity.  The anus is the sphincteral muscle in the structure at the base of the alimentary canal called the rectum, which lies below the buttocks.  The anal cavity is a hollow that lies within the anus.  Penetration of the anal cavity requires entry through the anus.  The 'however slight' standard in R.C. 2907.01(A) permits a finding that anal intercourse has occurred when there is evidence of some forceful spreading of the anus by the object concerned.  A spreading of only the buttocks, which forms no part of the anal cavity, is therefore insufficient for anal rape.  [*Wells* at 34.]"

*Remy* at ¶ 27, quoting *State v. Grant*, 2d Dist. Montgomery No. 19824, 2003-Ohio-7240, ¶ 27-28.

---

term vaginal cavity appears to require further penetration into the vaginal canal than the term vaginal opening").

{¶ 97} In *Remy*, however, the court held that evidence of a child's statements that the defendant had used his private "to touch her private in the back where she poops" and "hurt her butt with her [sic] private parts" was sufficient to establish that defendant penetrated her anus with his penis for purposes of anal rape convictions and that evidence of a child's statements that the defendant had touched her "in" her "private parts," which she identified as both her vaginal and anal areas, was sufficient to establish that that defendant had digitally penetrated the child's vagina and anus for purpose of vaginal and anal rape convictions. *Remy* at ¶ 29-45.

{¶ 98} In *In re D.C.*, this court held that the juvenile court erred by adjudicating an alleged juvenile offender, D.C., delinquent for rape where it was alleged that D.C. made the victim insert his own finger into his own anus. *Id.* at ¶ 2, 5, 8-9. When asked what D.C. did to the victim's finger, the victim (who was 8 at the time of the offense and 12 at the time of trial) testified: "He drove my hand with his own hand. * * * At my rear. He drove my hand to my rear, and then — * * * [h]eld my hand and he held it up to my bottom, and then —[i]nto my bottom." *Id.* at ¶ 5. No further testimony was cited in the opinion. Although recognizing that the victim testified D.C. drove his hand "into" his "bottom," the court held that, "without additional context, we cannot conclude the word 'bottom' meant anal opening as opposed to merely between the cheeks of the victim's buttocks." *Id.* at ¶ 8.

{¶ 99} The court explained:

> Child victims tend to have a limited understanding of human physiology. This fact and the tendency of parents to have their children use euphemisms for intimate parts of the body make it difficult to know

exactly what children mean when they give testimony about certain sexual conduct. The inherent imprecision of euphemisms for intimate body parts becomes an issue for purposes of anal rape. "If the evidence shows that the defendant made contact only with the victim's buttocks, there is not sufficient evidence to prove the defendant guilty of the crime of anal rape." *State v. Wells*, 91 Ohio St.3d 32, 740 N.E.2d 1097 (2001).

In cases finding sufficient proof of anal penetration, victims have given testimony showing actual penetration. *See, e.g., State v. Landers*, 2d Dist. Greene No. 2015-CA-74, 2017-Ohio-1194, ¶ 79 (victim testified that "penis went 'in' her 'butt' and went into her 'butthole,' but not all the way"); *State v. Phillips*, 6th Dist. Lucas No. L-09-1149, 2010-Ohio-2577, ¶ 58 (victim testified she felt what she believed was fingers "in my bottom" and answered affirmatively when asked if "fingers in her bottom meant your butt where you go to poop out of?"); *State v. Molen*, 2d Dist. Montgomery No. 21941, 2008-Ohio-6237, ¶ 31 (victim testified that defendant shoved something "up his butt" and that what had been put in his butt was "tickling [his] stomach"). That kind of evidence is not present in this case.

The victim's testimony did not establish what he meant by his bottom." Nor does the testimony indicate that penetration of the anal opening occurred. We acknowledge that the victim testified that D.C. drove his hand "into" his bottom, but without additional context, we cannot conclude that the word "bottom" meant anal opening as opposed to merely between the cheeks of the victim's buttocks.

We are aware that it can be difficult to elicit from a child victim the kind of specificity needed to prove the penetration required to establish an anal rape. But as this testimony stands, the essential element of anal penetration was not proven, despite the state's contention otherwise. We have no choice but to conclude that the state's evidence was insufficient to establish penetration of the anal opening.

*In re D.C.* at ¶ 6-9.

{¶ 100} This is not a case in which the evidence supported a finding that the defendant "made contact only" with "the victim's buttocks" or "bottom." In *In re M.P.*, 8th Dist. Cuyahoga No. 111608, 2023-Ohio-925, this court distinguished *In re*

*D.C.* and held that there was sufficient evidence of anal penetration to support a rape conviction where the child victim stated that "poop comes out of his bottom," that the defendant placed his private "inside" the child's bottom and "in his butt" and that when the defendant did this, it hurt. *Id* at ¶ 39, 42. M.F.'s statements in this case are more akin to those of the child victims in *Remy* and *In re M.P.* than those of the child victim in *In re D.C.*

{¶ 101} In this case, M.F. used the word "butt" rather than "bottom." Further, it could be discerned from M.F.'s statements and testimony that she understood and appreciated the difference between "on" and "outside" and "in" and "inside." "'In' is defined as 'within' and 'inside of.'" *State v. Garcia*, 8th Dist. Cuyahoga No. 107027, 2022-Ohio-3426, ¶ 45, quoting *Webster's Dictionary* (1999). When describing what Washington had done to her, M.F. repeatedly distinguished between instances in which Washington had "touched" her "butt" or the "outside" of her "butt" (or other areas) with his hand or his "private part" and instances in which Washington had placed his private part "in" or "inside" her "butt." When describing the final incident, i.e., the May 2020 incident on the couch at the Turney Road residence, M.F. testified that Washington had "touched" her butt with his hands and that he also "touched" and "licked" her private part. With respect to the issue of anal penetration, M.F. further testified:

Q. Okay. Now, did his private part touch you anywhere?

A. Yes.

Q. And where did his private part touch you?

A. My butt.

Q. Okay. And I'm sorry we have to ask you, [M.F.], okay? Are you talking about the outside of your butt or somewhere else?

A. Um — somewhere else.

Q. What's that somewhere else?

A. In.

Q. Did you say in your butt?

A. Yes.

{¶ 102} Lott testified that, during her SANE examination, M.F. told her that Washington "be *touching* me *on* my butt and my private part and my chest and stuff" and that "he put his private part *in my butt,*" "[w]here the poop comes out." M.F. further stated that Washington had put grease on his private part and that "white stuff" came out of his private part during the May 2020 incident.

{¶ 103} As detailed above, M.F. offered similar descriptions of Washington's conduct during the four prior incidents. M.F. stated that twice, when she lived on Clearaire Avenue, Washington entered her bedroom at night and, while she was sleeping with her sisters, Washington "put his private part in my butt," which made her feel "weird." M.F. testified that when they lived on Alice Avenue, Washington once "put his private part in my butt and touched my chest." M.F. stated that, after the family moved to Turney Road, she was in her room with her sisters at night when Washington "put his private part in my butt and touched my private part and my butt." M.F. testified that during these incidents, Washington would put "grease" on

his private part and that "white stuff" came out of his private part. Lott testified that M.F. told her that her butt would "hurt" after Washington finished. Mazza offered similar testimony regarding the five incidents M.F. had disclosed to her in which Washington had "put his private in [M.F.'s] butt."

{¶ 104} When viewed in the light most favorable to the state, this evidence was sufficient to establish penetration for purposes of the anal rape counts against Washington. Based on M.F.'s descriptions of what had occurred, a rational jury could find beyond a reasonable doubt that Washington had not merely put his penis on the outside of M.F.'s buttocks or between the cheeks of M.F.'s buttocks but had penetrated her "anal opening." *See, e.g., In re M.P.*, 2023-Ohio-925, at ¶ 39, 42; *Garcia*, 2022-Ohio-3426, at ¶ 37-48 (child victim's testimony that defendant "stuck two fingers in me * * * [i]n my lower area" when her underwear was off was sufficient to support rape conviction); *State v. Phillips*, 6th Dist. Lucas No. L-09-1149, 2010-Ohio-2577, ¶ 57-58 (there was sufficient evidence to support anal rape conviction where child victim testified she felt what she believed was fingers "in my bottom," which she identified as her "butt where you go to poop out of") (emphasis deleted). A victim's testimony regarding penetration "need not be corroborated by the medical evidence." *State v. Scott*, 8th Dist. Cuyahoga No. 110744, 2022-Ohio-2768, ¶ 38, citing *State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, 6 (May 28, 1996).

**Evidence of Force**

{¶ 105} Washington also contends that there was insufficient evidence to establish the element of force as to each of the rape charges of which he was convicted. He argues that his rape convictions should be overturned because (1) the state improperly told the jury during closing argument that "they could satisfy the element of force simply by finding the parent-child relationship," (2) the trial court failed to instruct the jury that "'fear, duress or intimidation' must be proven to be the result of the relationship, not just that it may be inferred once the relationship is established" and (3) "even if properly charged," there was insufficient evidence of force.

{¶ 106} We have already rejected Washington's arguments relating to the jury instructions and the state's closing argument above. Accordingly, we now turn to Washington's argument that "even if properly charged," there was insufficient evidence of force. We likewise find this argument to be unavailing.

{¶ 107} The type and amount of force necessary to compel a victim to submit "by force or threat of force" depends upon the age, size, strength and relationship between the victim and the offender. *See, e.g., Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304, at paragraph one of the syllabus; *State v. Thomas*, 8th Dist. Cuyahoga No. 107870, 2019-Ohio-3767, ¶ 21, citing *State v. Labus*, 102 Ohio St. 26, 38-39, 130 N.E. 161 (1921). There is no dispute that a parent-like relationship existed between Washington and M.F. in this case. M.F. testified that she had lived with Washington most of her life, that he was "kind of like a stepdad" to her and that he would do

"stepdad things" for her and her siblings, e.g., cook dinner, take her to the store and buy things for her. Mother testified that Washington was a "father figure" or "stepdad" to M.F. and her other children, i.e., "taking care of the kids, like feeding them, taking them places * * * like what * * * a dad is supposed to do." Washington admitted that he was a "father figure" and acted like a "dad" to all of Mother's children, "taking them to school, fixing them something to eat, doing [their] laundry, * * * taking them to the park, going out to eat * * * just doing things with them as a family."

{¶ 108} There was also substantial evidence that Washington was an authority figure, with the ability to exercise control and influence over M.F. M.F. testified that Washington would be in charge when Mother was not home and that she would get in trouble if she did not follow his rules. Mother testified that Washington had authority over M.F. as an adult and a father figure in the home. She stated that if M.F. violated Washington's rules while Mother was absent, Washington would tell Mother about it and Mother would discipline her.

{¶ 109} M.F. was between eight and ten years old when Washington raped her. M.F. testified that Washington had raped her multiple times at night after she had gone to sleep while M.F.'s younger sisters were sleeping in the same room. She stated that Washington was "very" quiet when he assaulted her so that he did not wake Mother or her sisters. M.F. told Mazza that, during the final incident, Washington came into the living room while she was watching television and told

her to take her pants off. M.F. testified that she was "sad" and "crying" as Washington raped her on the couch while Mother was sleeping in the basement.

{¶ 110} M.F. testified that she never told Mother what Washington had done to her because she did not feel "safe" doing so. M.F. stated that Washington told her not to tell anyone and that she was afraid that if she told Mother what Washington had done, Mother would tell Washington what she had said.

{¶ 111} As indicated above, where, as here, an alleged offender assumes a parent-like role and is in a position of authority over his young child victim, "force" "need not be openly displayed or physically brutal" but can be "subtle and psychological." *See, e.g., Dye*, 82 Ohio St.3d at 327-329, 695 N.E.2d 763; *Eskridge*, 38 Ohio St.3d at 57-59, 526 N.E.2d 304; *Scott*, 2022-Ohio-2768, at ¶ 41. When viewed in the light most favorable to the state, the evidence presented at trial was sufficient to establish "force," i.e., that M.F.'s will had been overcome by fear, duress or intimidation, for purposes of the rape counts against Washington. Contrary to Washington's assertion, the state was not required to "ask [M.F.] whether she felt that her will was overcome by virtue of [her] relationship" with Washington to prove "force." It is well established that the elements of an offense may be proven by circumstantial evidence as well as by direct evidence. *See, e.g., Scott* at ¶ 42-43; *State v. Bradshaw*, 3d Dist. Logan No. 8-22-09, 2023-Ohio-1244, ¶ 52.

{¶ 112} The evidence presented at trial was sufficient to establish the penetration and force elements of each of the rape counts of which Washington was convicted. Accordingly, we overrule Washington's first assignment of error.

**Manifest Weight of the Evidence**

{¶ 113} In his third assignment of error, Washington challenges his rape convictions on manifest-weight grounds.

{¶ 114} In contrast to a challenge based on sufficiency of the evidence, a manifest-weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. "'[W]eight of the evidence involves the inclination of the greater amount of credible evidence.'" *State v. Harris*, 8th Dist. Cuyahoga No. 109060, 2021-Ohio-856, ¶ 32, quoting *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. On a manifest-weight challenge, the reviewing court asks "whose evidence is more persuasive — the state's or the defendant's?" *State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25.

{¶ 115} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of * * * conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"

*Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversal on manifest-weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 116} In support of his manifest-weight challenge, Washington simply "incorporates by reference the argument[s]" raised in his first assignment of error challenging the sufficiency of the evidence and asserts (without further explanation, argument or citation to the record) that M.F.'s "extremely vague" testimony on the issue of penetration and the remaining evidence (or the "lack thereof") "causes [the jury's] verdicts to be against the manifest weight of the evidence."

{¶ 117} An appellant's brief must include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." App.R. 16(A)(7). An appellate court is not obliged to construct or develop arguments to support a defendant's assignment of error and "'will not "guess at undeveloped claims on appeal."'" *State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 56 (8th Dist.), quoting *State v. Piatt*, 2020-Ohio-1177, 153 N.E.3d 573, ¶ 39 (9th Dist.), quoting *McPherson v. Goodyear Tire & Rubber Co.*, 9th Dist. Summit No. 21499, 2003-Ohio-7190, ¶ 31; *see also State v. Collins*, 8th Dist. Cuyahoga No. 89668, 2008-Ohio-2363, ¶ 91 ("'[I]t is not the duty of this Court to develop an argument in support of an assignment of error if one exists.'"), quoting *State v. Franklin*, 9th

Dist. Summit No. 22771, 2006-Ohio-4569, ¶ 19; *see also Bradshaw*, 2023-Ohio-1244, at ¶ 68 (noting that an appellate court need not construct and then resolve, a manifest-weight argument on behalf of the defendant where defendant's manifest-weight challenge "simply duplicates claims he made when challenging the sufficiency of the evidence supporting the same claims"), citing *State v. Laws*, 3d Dist. Allen No. 1-20-10, 2021-Ohio-166, ¶ 32.

{¶ 118} Even if Washington's "incorpor[ation] by reference" of arguments from other sections of his appellate brief were sufficient to comply with his obligation to argue each assignment of error "separately in the brief," as required under App.R. 12(A)(2) and 16(A)(7), we would find his arguments to be meritless.

{¶ 119} A conviction may rest solely on the testimony of a single witness, including the alleged victim, if it is believed, and there is no requirement that a witness' testimony be corroborated to be believed. *See, e.g., State v. Nicholson*, 8th Dist. Cuyahoga No. 110595, 2022-Ohio-2037, ¶ 180*; State v. Flores-Santiago*, 8th Dist. Cuyahoga No. 108458, 2020-Ohio-1274, ¶ 38; *State v. Black*, 2019-Ohio-4977, 149 N.E.3d 1132, ¶ 43 (8th Dist.). As detailed above, the state presented ample, credible evidence upon which a reasonable jury could have found, beyond a reasonable doubt, that Washington raped M.F. as charged.

{¶ 120} Here, the jury heard directly from M.F. regarding five incidents in which Washington "put his private part in [her] butt," one incident in which he "licked [her] private part," other instances of sexual contact with Washington and where M.F. was living when each of these incidents occurred. Mother testified

regarding the time frames during which the family lived at each of these residences. The jury also heard detailed testimony from Mazza and Lott regarding what M.F. had told them about each of the incidents. Throughout the investigation of M.F.'s allegations of sexual abuse — including interviews with Lott, Mazza and the police — M.F.'s retelling of what Washington had done to her remained consistent. M.F. related the same facts to the jury during her testimony at trial.

{¶ 121} The serology testing and DNA analysis conducted by Ross further supported the state's case against Washington. Ross testified that DNA found on the underwear M.F. allegedly wore at the time of the May 2020 incident was consistent with Washington's DNA and was found in the "sperm fraction" — the area likely containing sperm cells. Although Washington claimed that his DNA was on M.F.'s underwear because he did the family's laundry, a reasonable jury could have concluded otherwise.

{¶ 122} Washington's general complaints regarding the "vagueness" of M.F.'s testimony do not compel a finding that his convictions were against the manifest weight of the evidence. *See, e.g., State v. McCall*, 8th Dist. Cuyahoga No. 104479, 2017-Ohio-296, ¶ 12-16 (rejecting defendant's claims that his convictions for rape by digital and vaginal penetration were against the manifest weight of the evidence "due to the victim's uncorroborated, vague, and inconsistent testimony"); *State v. Laseur*, 12th Dist. Warren Nos. CA2002-10-117 and CA2002-11-121, 2003-Ohio-3874, ¶ 16-19 (affirming defendant's convictions for attempted rape and gross sexual imposition and overruling manifest-weight challenge based on defendant's

claim that the "only evidence" supporting his convictions was "the girls' vague, uncorroborated testimony"). Likewise, Washington's convictions were not against the manifest weight of the evidence merely because the jury believed the testimony and statements of M.F. over the testimony of Washington where, as here, the jury could reasonably make that choice. *See, e.g., Scott*, 2022-Ohio-2768, at ¶ 40 (a conviction is not against the manifest weight of the evidence merely because the jury chose to believe the prosecution's witnesses); *State v. Fry*, 9th Dist. Medina No. 16CA0057-M, 2017-Ohio-9077, ¶ 13 ("We will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version."); *State v. Chatman*, 10th Dist. Franklin No. 08AP-803, 2009-Ohio-2504, ¶ 34 ("[A] conviction is not against the manifest weight of the evidence simply because the trier of fact chose to believe the prosecution's witnesses and to not believe appellant."). Washington has not shown that M.F.'s testimony and statements were so inherently incredible or unreliable as to preclude a reasonable fact finder from believing them. As the trier of fact, the jury was free to believe all, some or none of the testimony of each of the witnesses appearing before it. *State v. Jones*, 8th Dist. Cuyahoga No. 108371, 2020-Ohio-3367, ¶ 85; *State v. Sheline*, 8th Dist. Cuyahoga No. 106649, 2019-Ohio-528, ¶ 100.

{¶ 123} Weighing the strength and credibility of the evidence presented and the reasonable inferences to be drawn therefrom, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice such that Washington's

convictions must be reversed. This is not the "'exceptional case'" in which the evidence weighs heavily against Washington's convictions. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Accordingly, we overrule Washington's third assignment of error.

**Referring to M.F. as the "Victim"**

{¶ 124} In his second assignment of error, Washington argues that he was deprived of his presumption of innocence and denied his right to a fair trial because, "[t]hroughout the trial," the state, witnesses and the trial judge referred to M.F. as "the victim." Washington contends that referring to M.F. as "the victim" rather than "the alleged victim" "lent undue credence to her testimony" and "created a[n] affirmance by the Court and counsel that [M.F.] was indeed a victim," "improperly signal[ling] to the jury that the claimed events had in fact taken place."

{¶ 125} Once again, because Washington failed to object to this below, he has forfeited all but plain error. *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860 at ¶ 3, 21-22.

{¶ 126} As the Eleventh District observed in *State v. Aboytes*, 11th Dist. Lake No. 2020-L-001, 2020-Ohio-6806:

> The term "victim" means "[a] person harmed by a crime, tort, or other wrong." VICTIM, *Black's Law Dictionary* (11th Ed.2019). Depending on context, a party's use of the term "victim" at trial may imply that the charged offenses occurred, which reduces the state's burden of proof. Therefore, it is more appropriate for the parties to use the phrase "alleged victim" at trial to reflect the defendant's presumption of innocence.

*Aboytes* at ¶ 180. However, use of the term "victim" is not necessarily "the same as expressing an opinion that a defendant is guilty of a crime." *State v. Palmer*, 7th Dist. Mahoning No. 19 MA 0108, 2021-Ohio-4639, ¶ 83.

{¶ 127} In this case, Washington challenges the following uses of "victim" by the trial judge, the assistant prosecuting attorney and a witness prior to or during the trial:

- While reading the counts of the indictment to the jury at the outset of the voir dire process, the trial judge stated: "Counsel, I don't have the name of the victim. Tell me it, please, again." Tr. 120.

- During voir dire, the assistant prosecuting attorney asked potential jurors:

    Q. Is there anybody — I think we're going to put this question out for everyone, who has been a victim of something like this, or had a close friend or family member who is a victim of something like this, rape, or sexual assault? Tr. 155.

- During the state's opening statement, the assistant prosecuting attorney stated: "The victim's name in this case is [M.F.]." Tr. 292.

- A police officer, who in describing labeling on evidence bags and the sexual assault evidence collection kit, testified:

    Q. Now, does that bag have any other identifying factors on it as far as suspect name or victim's name, Officer?

    A. It has a victim name of [M.F.], a suspect name of Phillip Washington.

    * * *
    Q. And then what other identifying factors are on that SANE kit?

    A. On here it has [M.F.], her birth date. It shows who it was secured by, released by, which is me. It has our report number, description of evidence, a SANE kit from Hillcrest Hospital for

[M.F.], the offense, which is a sex offense, the victim, [M.F.] and the suspect, Phillip Washington. Tr. 397-399.

{¶ 128} In support of his contention that he was deprived of his presumption of innocence and denied a fair trial, Washington cites *State v. Almedom*, 10th Dist. Franklin No. 15 AP-852, 2016-Ohio-1553, and *State v. Vetetom*, 8 S.W.3d 805 (Tex.App.2000).

{¶ 129} In *Vetetom*, the defendant argued that the trial court had improperly commented on the weight of the evidence by referring to the sexual assault complainant as the "victim" instead of the "alleged victim" in a jury instruction regarding sufficiency of proof that "singled out her testimony." *Id.* at 816. The court observed that referring to the complainant "as the victim instead of the alleged victim lends credence to her testimony that the assaults occurred and that she was, indeed, a victim." *Id.* The court, however, did not consider whether the usage was prejudicial because it had already found other reversible error. *Id.* at 817.

{¶ 130} In *Almedom*, the Tenth District vacated the defendant's convictions for rape and gross sexual imposition involving three girls under the age of 13. *Almedom* at ¶ 1-4, 25. The court found that the defendant was denied "the opportunity for a fair trial" in part, because his trial counsel failed to object to the trial judge's repeated references to the complaining witnesses as "victims," which the court found was "in essence, * * * telling the members of the jury that the girls were truthful when they claimed that sexual abuse occurred, as opposed to telling

the jury Almedom was truthful in his denial, or refusing to comment on the credibility of any potential witnesses." *Id*. at ¶ 2-4, 10-12. The court found that the defendant had been prejudiced by the inappropriate references because "[t]he trial court judge * * * is viewed as the ultimate authority figure in the courtroom" and that "the conduct of defense counsel linked with the prejudicial comments of the trial judge when added to those of the assistant prosecuting attorney during jury selection undermined the proper function of the adversarial process" was such that the court could not "be sure a just result was produced." *Id*. at ¶ 10-12.

{¶ 131} In *Almedom*, most of the offending references were made by the trial judge, not the prosecutor or witnesses. *Almedom* at ¶ 2-4, 10-12. In *Almedom*, the trial judge had "consistently" referred to the girls as victims. *Id*. at ¶ 2. Further, the Tenth District found that defense counsel had performed deficiently by not only failing to object to the trial court's "consistent" references to the children as "victims," but also by failing to ask for a mistrial or a limiting instruction after one of the three girls was not called to testify and the charge involving her was dismissed on the state's motion, by failing to file any pretrial motions other than a motion for a bill of particulars, by failing to file a motion to determine the competency of the children who were expected to testify (one of whom was six years old at the time of trial) and by repeatedly failing to object to questions on direct examination and to "huge" portions of the state's evidence, including extrajudicial interviews of the girls. *Id*. at ¶ 2-8. It was the combination of these factors, i.e., "the conduct of the trial judge * * * linked with the deficient conduct of defense counsel," that led the court

to conclude that the defendant was denied "the opportunity of a fair trial * * * in which his defense could be fairly considered." *Id.* at ¶ 10-12. As a result, the court vacated the defendant's convictions and remanded the case for further proceedings. *Id.* at ¶ 10-13, 25. This case is very different. *See, e.g., Aboytes*, 2020-Ohio-6806, at ¶ 184-196; *Palmer*, 2021-Ohio-4639, at ¶ 85-90; *State v. Nichols*, 10th Dist. Franklin Nos. 19AP-113 and 19AP-116, 2020-Ohio-4362, ¶ 39.

{¶ 132} In this case, there are no comparable claims of deficient performance by defense counsel. This is not a case in which the trial judge "singled out" "the victim's" testimony in its jury instructions or "consistently" referred to the complainant as the "victim." Washington complains of a single use of the term "victim" by the trial judge at the beginning of voir dire. When the trial judge began reading the indictment to potential jurors at the outset of the voir dire process, she asked counsel for the name of "the victim" so that she could reference M.F. by name, instead of as "Jane Doe," when reading the indictment to the potential jurors, "in case [the potential jurors] would know her or her family." Moments earlier the trial judge had instructed the jurors to "pay attention" as she read the indictment "so that if you have any knowledge of the incident, or any of the parties mentioned in the indictment, you may bring that to our attention." Considering the trial court's usage of "victim" in context, it is clear that the trial judge was using the term "victim" to refer to the identity of the complainant, not to express a view that crimes had occurred or that Washington was guilty of those crimes.

{¶ 133} Immediately after reading the charges in the indictment to the jury, the trial judge explained that an indictment is "made solely for the Defendant's information and protection" and that its purpose is "to furnish the Defendant with a written statement of the accusation or charge made against him so that he may be able and advised of the nature of the charge and be able to prepare a defense thereto" and that "[i]t may not be considered for any other purpose." Tr. 124-125, 688. The trial judge stated that Washington had pled not guilty to the charges against him and further instructed the jury:

> It therefore follows that the mere fact that an indictment was returned against the Defendant creates no presumption of guilt, nor does it give rise to any inference of his guilt.

> On the contrary, under our law, he is clothed with the legal presumption of innocence, and this presumption of innocence remains with him throughout the trial until overcome by evidence which convinces the jury beyond a reasonable doubt of his guilt.

Tr. 125-126; *see also* tr. 688-690.

{¶ 134} The trial judge also specifically instructed the jury:

> Any impression that you might gleam as to how you think I would decide this case, from anything that I say or do in this case, you must disregard it and erase it from your minds and be guided wholly and solely from the evidence that you will hear in this courtroom.

> I do not make decisions on your duties, so don't think that I do.

Tr. 284. We must presume that the jury followed these instructions. *See, e.g.*, *Wilson*, 2023-Ohio-1046, at ¶ 19, citing *Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, at ¶ 147.

{¶ 135} The other usages of the term "victim" regarding which Washington complains are two statements made by the assistant prosecuting attorney and references to the term "victim" on evidence labels to which Officer Moore testified.

{¶ 136} The assistant prosecuting attorney's isolated references to M.F. as the "victim" — once during voir dire questioning of potential jurors and once during the state's opening statement — were not such that they would "lend undue credence" to her testimony that a crime had occurred.

{¶ 137} "While a trial judge must remain detached and neutral in any matter before the court, a prosecutor is not constrained by any such obligation of neutrality." *Aboytes*, 2020-Ohio-6806, at ¶ 189. The jury is aware that prosecutors are advocates and that "prosecutors and witnesses have biases." *Jackson*, 2023-Ohio-455, at ¶ 25-26 (observing that courts have held that "a prosecutor's or a witness's use of the term 'victim' to refer to a complaining witness does not rise to the level of plain error"), citing *State v. Butts*, 8th Dist. Cuyahoga No. 108381, 2020-Ohio-1498, ¶ 41, and *State v. Madden*, 2017-Ohio-8894, 100 N.E.3d 1203, ¶ 26-34 (10th Dist.).

{¶ 138} As it relates to law enforcement officers recounting their role in an investigation, the term "victim" has often found to be "'a term of art synonymous with "complaining witness."'" *Madden* at ¶ 32, quoting *Jackson v. State*, 600 A.2d 21, 24-25 (Del.1991). With respect to the evidence labels referenced during Moore's testimony, it is clear from the context that the term "victim" was used on the labels to refer to the identity of the complainant, not to express a view that a particular

crime had occurred or, if so, that Washington was guilty of that crime. Moore testified that, in addition to a marking identifying M.F. as the victim, the labels included a report number, markings to identify the persons who had handled the evidence and a description of the evidence and offense. He indicated that Washington was identified on the evidence labels as a "suspect."

{¶ 139} The trial judge repeatedly instructed the jury that Washington was presumed innocent, that it was the state's obligation "to prove every material element that constitutes the crime or offense with which a defendant is charged by evidence which convinces the jury beyond a reasonable doubt" and that it was the jury's role — and no one else's role — to "decide the facts" and determine the guilt or innocence of the defendant "after carefully consider[ing] and compar[ing] all the evidence." Tr. 125-126, 129-130, 284, 689-691, 694. The trial judge also specifically instructed the jurors that opening statements "are not evidence," that "the attorneys are not witnesses" and that "since it is your duty to decide this case solely on evidence that you hear or see in the courtroom, you must not consider as evidence any statement of any attorney made throughout these proceedings." Tr. 284, 291, 648, 695. Once again, we presume that the jury followed these instructions.

{¶ 140} Following a thorough review of the record, we find no indication that the adversarial process was undermined or that Washington was otherwise prejudiced as a result of the limited usages of the term "victim" below. *See Aboytes*, 2020-Ohio-6806, at ¶ 184-196; *Palmer*, 2021-Ohio-4639, at ¶ 85-90; *Butts*, 2020-Ohio-1498, at ¶ 41.

{¶ 141} As detailed above, substantial, competent, credible evidence supported Washington's convictions. Washington cannot demonstrate that the outcome at trial would have been different but for these limited usages of the term "victim." Washington's second assignment of error is overruled.

**Ineffective Assistance of Counsel**

{¶ 142} In his fifth assignment of error, Washington contends that he was denied the effective assistance of counsel based on his trial counsel's (1) failure to object to or request an addition to the trial court's jury instructions regarding the use of force ("as set forth in Assignment of Error IV") and (2) failure to object to the trial judge's, the assistant prosecuting attorney's and Officer Moore's references to M.F. as "the victim" ("as set forth in Assignment of Error II").

{¶ 143} A criminal defendant has the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As a general matter, to establish ineffective assistance of counsel, a defendant must demonstrate: (1) deficient performance by counsel, i.e., that counsel's performance fell below an objective standard of reasonable representation, and (2) that counsel's errors prejudiced the defendant, i.e., a reasonable probability that but for counsel's errors, the outcome of the proceeding would have been different. *Id.* at 687-688, 694; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus. "Reasonable probability" is "probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶ 144} In Ohio, a properly licensed attorney is presumed to be competent. *Black*, 2019-Ohio-4977, 149 N.E.3d 1132, at ¶ 35, citing *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Because there are "countless ways to provide effective assistance in any given case," on a claim of ineffective assistance of counsel, the court must give great deference to counsel's performance and "indulge a strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland* at 689; *see also State v. Powell*, 2019-Ohio-4345, 134 N.E.3d 1270, ¶ 69 (8th Dist.) ("'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"), quoting *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69.

{¶ 145} As stated above, we have found no error in the trial court's jury instructions regarding force. Accordingly, defense counsel's failure to object to those instructions or to offer additional "force" instructions is of no effect. Trial counsel cannot be deemed deficient or ineffective for failing to perform a futile act. *See, e.g., State v. May*, 2015-Ohio-4275, 49 N.E.3d 736, ¶ 35 (8th Dist.), citing *State v. Witherspoon*, 8th Dist. Cuyahoga No. 94475, 2011-Ohio-704, ¶ 33 ("[T]he failure to do a futile act cannot be the basis for claims of ineffective assistance of counsel and is not prejudicial.").

{¶ 146} Whether to object to evidence presented or to statements made in the presence of the jury is often regarded as a strategic or tactical decision. *See, e.g., State v. Frierson*, 2018-Ohio-391, 105 N.E.3d 583, ¶ 25 (8th Dist.). Strategic or

tactical decisions ordinarily do not constitute ineffective assistance of counsel. *See, e.g., State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101, 111; *Black* at ¶ 35. As such, the failure to make an objection is generally not, in and of itself, sufficient to sustain a claim of ineffective assistance of counsel. *Conway* at ¶ 103; *Frierson* at ¶ 25; *Black* at ¶ 35; *see also State v. C.D.S.,* 10th Dist. Franklin No. 20AP-355, 2021-Ohio-4492, ¶ 109 (observing that "[i]t is * * * conceivable that defense counsel did not want to bring further attention to the issue as part of the trial strategy by insinuating appellant did not trust the jury's ability to identify the word 'victim' as a reference to a complaining witness").

{¶ 147} Even if defense counsel were deficient for failing to object to the usages of "victim" below, Washington has not shown that he was prejudiced by such failures, i.e., that there is a reasonable probability that, but for, his trial counsel's failure to make those objections, the result of the proceeding would have been different.

{¶ 148} Accordingly, we overrule Washington's fifth assignment of error.

**Cruel and Unusual Punishment**

{¶ 149} In his sixth and final assignment of error, Washington challenges the constitutionality of his life sentence without the possibility of parole. Although Washington did not challenge the constitutionality of his sentence below, he now contends that "[a] sentence with no meaningful parole eligibility date" is "cruel and unusual," is "incompatible with human dignity," offends "society's standards of decency" and, therefore, violates Article I, Sections 9, 10 and 16 of the Ohio

Constitution and the Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 150} The Eighth Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment, provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Article I, Section 9 of the Ohio Constitution similarly provides: "Excessive bail shall not be required; nor excessive fines imposed; nor cruel and unusual punishments inflicted." While Article I, Section 9 of the Ohio Constitution is similar to the Eighth Amendment to the United States Constitution, "it also provides independent protection." *State v. Morris*, Slip Opinion No. 2022-Ohio-4609, ¶ 7, citing *State v. Blankenship*, 145 Ohio St.3d 221, 2015-Ohio-4624, 48 N.E.3d 516, ¶ 31.

{¶ 151} Washington does not identify the provisions of Article I, Section 10 or Section 16 of the Ohio Constitution that he contends his sentence violates. Although Washington asserts that the Ohio Constitution "offers more protection than the federal constitution," he does not develop this argument, i.e., he does not support his argument with citations to legal authority and does not explain how, why or on what basis the imposition of a life sentence without the possibility of parole for the rape of a young child would violate the Ohio Constitution where it would not violate the United States Constitution. Accordingly, we need not address those contentions here. App.R. 12(A)(2); App.R. 16(A)(7).

{¶ 152} "A key component of the Constitution's prohibition against cruel and unusual punishment is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" *State v. Moore*, 149 Ohio St.3d 557, 2016-Ohio-8288, 76 N.E.3d 1127, ¶ 31, quoting *Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910). To constitute cruel and unusual punishment, "'the penalty must be so greatly disproportionate to the offense as to shock the sense of justice of the community.'" *State v. Anderson*, 151 Ohio St.3d 212, 2017-Ohio-5656, 87 N.E.3d 1203, ¶ 27, quoting *McDougle v. Maxwell*, 1 Ohio St.2d 68, 70, 203 N.E.2d 334 (1964). Generally, if a sentence falls within the terms of a valid statute, it cannot constitute cruel and unusual punishment. *See State v. Johnson*, 8th Dist. Cuyahoga No. 80436, 2002-Ohio-7057, ¶ 119, citing *McDougle v. Maxwell*, 1 Ohio St.2d 68, 69, 203 N.E.2d 334 (1964), and *State v. Juliano*, 24 Ohio St.2d 117, 120, 265 N.E.2d 290 (1970).

{¶ 153} Washington cites no state or federal case law holding that a sentence of life without the possibility of parole imposed on an adult following his or her conviction for rape of a young child constitutes cruel and unusual punishment in violation of the Eighth Amendment. Rather, his argument focuses on general notions of "respect" for "the dignity of all persons," a few law review articles and a 2022 decision from the Supreme Court of Canada, *R. v. Bissonnette*, 2022 SCC 23.

{¶ 154} In *Bissonnette*, the Supreme Court of Canada held that a provision of Canada's Criminal Code that authorized the imposition of consecutive periods of parole ineligibility in cases involving multiple murders was unconstitutional under

section 12 of the Canadian Charter of Rights and Freedoms (the "Charter"), which guarantees the right not to be subjected to cruel and unusual treatment or punishment. *Id.* at ¶ 4-5. Under Canadian law, an adult convicted of first-degree murder receives an automatic life sentence with no possibility of parole for 25 years. Section 745.51 authorized the trial court, in cases involving multiple murders, to impose consecutive periods of parole ineligibility for each murder in 25-year increments. *Id.* at ¶ 3, 7. In *Bissonnette*, the offender, who had murdered six people (and had seriously injured several others) in an attack on a mosque, pled guilty to multiple charges including six counts of first-degree murder. *Id.* at ¶ 10-12. The crown had asked the trial court to apply section 745.51 and impose a life sentence with no possibility of parole for 150 years. *Id.* at ¶ 12.

{¶ 155} The Supreme Court of Canada stated that the purpose of section 12 "is to protect human dignity and ensure respect for the inherent worth of each individual." *Id.* at ¶ 5. The court explained: "To ensure respect for the inherent dignity of every individual, [section] 12 of the Charter requires that Parliament leave a door open for rehabilitation, even in cases where this objective is of secondary importance. In practical terms, this means that every inmate must have a realistic possibility of applying for parole." *Id.* at ¶ 9; *see also id.* at ¶ 85. Because section 745.51 "authorize[d] the imposition of sentences of imprisonment without a realistic possibility of parole before death" and in effect "depriv[ed] offenders in advance" of any possibility of reformation and reintegration into society, the court found that the provision imposed a "degrading punishment" that was "incompatible with

human dignity" and "cruel and unusual by nature" and was, therefore, unconstitutional under section 12 of the Charter. *Id.* at ¶ 84-85, 87, 139-140.[8]

{¶ 156} That decision is not applicable here.

{¶ 157} Rape of a young child is a serious offense that should result in a serious punishment. Ohio appellate courts have held that a sentence of life without parole for the rape of a child under the age of ten does not violate the Eighth Amendment's prohibition against cruel and unusual punishment. *See, e.g., State v. Kidd*, 1st Dist. Hamilton No. C-200356, 2021 Ohio App. LEXIS 3803, 24-25 (Oct. 29, 2021); *State v. Glaze*, 6th Dist. Lucas No. L-17-1269, 2019-Ohio-53, ¶ 23-26, 30 (sentence of life without parole for the rape of a child under the age of ten "was not disproportionate to the conduct involved, did not violate his substantive due process rights, and did not constitute cruel and unusual punishment"); *State v. Driscoll*, 2d Dist. Clark No. 2008 CA 93, 2009-Ohio-6134, ¶ 29 ("[Defendant's] sentence of life without parole for raping [a] four year old * * * in violation of R.C.

---

[8] In reaching this conclusion, the court considered, among other things, the history of section 745.51, "how the treatment of people convicted of murder in Canada has changed over time," the operation of the parole system in Canada, the sentencing objectives in Canadian criminal law, "international and comparative law perspectives" and the "fundamental values of Canadian society" "enshrined" in the Charter. *Bissonnette* at ¶ 2, 27-108.

The court noted that "[i]n the United States, * * * imprisonment for life without the possibility of parole is considered constitutional * * * except in the case of juvenile offenders * * *, including those convicted of murder * * *. However, the American approach differs from the one that exists under Canadian law, since that country applies the death penalty and has a narrower interpretation of the concept of cruel and unusual punishment. (*Kindler [v. Canada (Minister of Justice)*, [1991] 2 S.C.R. 779, 812])." *Id.* at ¶ 107.

2907.02(A)(1)(b), does not constitute cruel and unusual punishment, because it is 'not disproportionate or shocking to the moral sense of the community, in view of the heinous nature of the crime.'"), quoting *State v. McConnell*, 2d Dist. Montgomery No. 19993, 2004-Ohio-4263, ¶ 142.

{¶ 158} Here, Washington was found guilty of multiple counts of rape of M.F. when she was less than ten years old. A sentence of life without parole is within the statutory range for rape of a child under the age of ten in Ohio. Washington has not shown that such a sentence is disproportionate to the conduct involved, is shocking to the moral sense of the community or otherwise constitutes cruel and unusual punishment under the United States or Ohio Constitutions.

{¶ 159} Washington's sixth assignment of error is overruled.

{¶ 160} Judgment affirmed. Case remanded for the trial court to issue a nunc pro tunc, modifying its April 27, 2022 sentencing journal entry to reflect that the jury returned a verdict of guilty of gross sexual imposition in violation of R.C. 2907.05(A)(4) on Count 2.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.


_____
EILEEN A. GALLAGHER, JUDGE

ANITA LASTER MAYS, A.J., and
EILEEN T. GALLAGHER, J., CONCUR